**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Mark Stephen BENSKIN,**
**Defendant–Appellant.**

**No. 90–5707.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 25, 1991.

Decided Feb. 26, 1991.

W. Hickman Ewing, Jr., U.S. Atty., Dan Newsom, Asst. U.S. Atty. (argued), Office of U.S. Atty., Memphis, Tenn., for plaintiff-appellee.

Daniel D. Warlick (argued), Warlick, Todd & Huffstutter, Nashville, Tenn., for defendant-appellant.

Before KEITH and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.

CONTIE, Senior Circuit Judge.

Mark Stephen Benskin appeals the length of his sentence following his guilty plea to mail and securities fraud. For the following reasons, we affirm the district court's sentencing determination.

## I.

Immediately after Mark Stephen Benskin ("Benskin" or "appellant") established his purported insurance and investment company, Mark Benskin & Company, Inc. ("MBC"), in February, 1983, MBC (through Benskin) began selling insurance to the public. Soon thereafter, as part of a scheme to defraud investors that began in late 1984 and continued until the appellant's arrest on April 6, 1989, Benskin held himself out as a broker-dealer, fully licensed and authorized to purchase, sell and otherwise trade in registered securities and commodities futures when, in fact, neither Benskin nor MBC were licensed by any recognized regulatory body. After luring unsuspecting investors, Benskin deposited the investors' funds (cash, checks and/or stock certificates) into his personal account and would, thereafter, use the deposited funds for his own benefit, often investing money in his own name and in the name of MBC.

Benskin solicited more than 3.8 million dollars from over 600 investors (residing in twenty-two states) through seminars, telephone conversations, and personal meetings. In order to conceal the scheme to defraud, Benskin caused fictitious customer account statements (indicating securities transactions that never took place and securities positions that were partially, or wholly, inaccurate) to be prepared, and mailed, to investors. In a further effort to conceal the fraud, Benskin issued checks (to quell any investor suspicion) to investors that requested a portion of their purported investment profits; Benskin often used money misappropriated from later investors to fund these payments.

Benskin generally preyed on private citizens, not corporate investors. In fact, the total customer loss exceeds three million dollars—savings that investors had set aside for retirement and for their childrens' education.

Benskin was taken into custody on April 6, 1989. On June 13, 1989, a federal grand jury issued a fifty (50) count indictment charging Benskin, and his company (MBC), with mail fraud (Counts 1 through 40) in violation of 18 U.S.C. §§ 2 and 1341, and securities fraud (Counts 41 through 50) in violation of 15 U.S.C. §§ 77q(a) and 77x,

and 18 U.S.C. § 2. After pleading "not guilty" at the June 15, 1989 arraignment, Benskin (on behalf of himself and MBC) pled guilty on September 5, 1989, to all fifty counts charged in the indictment.

Benskin appeared before the district court judge for sentencing on April 27, 1990, following the preparation and filing of the Probation Office's presentence report. Because the offenses charged in Counts 1 through 10 of the indictment occurred prior to November 1, 1987 (the United States Sentencing Guidelines' effective date), the Sentencing Guidelines govern Counts 11 through 50 only. Accordingly: regarding Counts 1 through 10, the district court judge sentenced Benskin to five (5) years imprisonment on each count (to run concurrent with each other but consecutive to the sentence imposed on Counts 11 through 50); regarding Counts 11 through 50, the district court judge departed from the applicable guideline range (pursuant to the government's departure request) of twenty-seven to thirty-three (27–33) months and sentenced Benskin to sixty (60) months imprisonment to be followed by three (3) years supervised release.

Benskin thereafter filed a timely notice of appeal. Benskin's sole assignment of error on appeal pertains to the district court's decision to depart from the applicable guideline range.

## II.

Benskin argues that "the aggravating or mitigating circumstances alleged, as set forth by the District Judge during sentencing in this cause, are adequately taken into consideration by the Sentencing Commission in formulation of the Guidelines, and further, respectfully urges this Court that the 'doubling' of the effective Guideline Sentence is an unreasonable upward departure, even if aggravated or mitigating circumstance [sic] not adequately taken into consideration by the Sentencing Commission were found in the case." Appellant's Brief at 4.

The United States Sentencing Guidelines specify when departure from the applicable guideline range is appropriate:

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The controlling decision as to whether and to what extent departure is warranted can only be made by the court at the time of sentencing.... Similarly, the court may depart from the guidelines, even though the reason for departure is listed elsewhere in the guidelines (*e.g.*, as an adjustment or specific offense characteristic), if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate.

Where the applicable guidelines, specific offense characteristics, and adjustments do take into consideration a factor listed in this part, departure from the guideline is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense of conviction.

United States Sentencing Commission, *Guidelines Manual*, § 5K2.0 (June 1988).

The Sixth Circuit employs a three-step analysis to review district court departures from the Sentencing Guidelines. *United States v. Joan*, 883 F.2d 491, 494 (6th Cir. 1989) (adopting the analysis announced in *United States v. Diaz–Villafane*, 874 F.2d 43, 49 (1st Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989)). *See also United States v. Nelson*, 918 F.2d 1268 (6th Cir.1990) (employing the three-step *Diaz–Villafane* analysis). The *Diaz–Villafane* analysis utilizes three varying standards of review:

First, we assay the circumstances relied on by the district court in determining that the case is sufficiently "unusual" to warrant departure. That review is es-

sentially plenary: whether or not circumstances are of a kind or degree that they may appropriately be relied upon to justify departure is, we think, a question of law.

Second, we determine whether the circumstances, if conceptually proper, actually exist in the particular case. That assessment involves factfinding and the trier's determinations may be set aside only for clear error.

Third, once we have assured ourselves that the sentencing court considered circumstances appropriate to the departure equation and that those factors enjoyed adequate record support, the direction and degree of departure must, on appeal, be measured by a standard of reasonableness. In this context, reasonableness is determined with due regard for "the factors to be considered in imposing a sentence," generally, and "the reasons for the imposition of the particular sentence, as stated by the district court...."

This third step involves what is quintessentially a judgment call. District courts are in the front lines, sentencing flesh-and-blood defendants. The dynamics of the situation may be difficult to gauge from the antiseptic nature of a sterile paper record. Therefore, appellate review must occur with full awareness of, and respect for, the trier's superior "feel" for the case. We will not lightly disturb decisions to depart, or not, or related decisions implicating degrees of departure.

*United States v. Diaz–Villafane,* 874 F.2d at 49–50 (citations omitted) (footnote omitted). *See also United States v. Nelson,* 918 F.2d at 1270–71 ("[T]he *Diaz–Villafane* review methodology ... is now the settled standard of review for guideline departure cases in this circuit.").

## A.

■ Accordingly, "[o]ur first duty in applying the first prong of *Diaz–Villafane* is to identify the 'circumstances' relied upon by the trial court in departing from the guidelines and then to decide, *de novo,* whether those circumstances are sufficient-

ly 'unusual' to justify the departure." *United States v. Nelson,* 918 F.2d at 1271 (citing *United States v. Diaz–Villafane,* 874 F.2d at 49; *United States v. Rodriguez,* 882 F.2d 1059, 1067 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1144, 107 L.Ed.2d 1048 (1990)).

The district court judge articulated the following reasons justifying her departure from Benskin's applicable sentencing range:

> I have had the opportunity to see a number of very complex and extensive fraud cases in this district in the past few years. Comparing Mr. Benskin with those cases, I would say this. I think Mr. Benskin is the most personally culpable individual I have seen. This is a fraud that was extremely large in scope. 600 investors identified by the government in twenty-two states. $3,800,000 invested by individuals....

> The fraud occurred over a very prolonged period of time. It was perpetuated on a regular basis through the false statements that were sent to the investors, so I would have to say that in terms of the nature of the fraud, its scope, and, of course, certainly in terms of the harm, and very importantly in terms of the harm it caused those individuals, certainly, I would have to categorize Mr. Benskin as about the personally most culpable individual I have seen in a large fraud case.

> In this particular case the Court believes the upward departure is warranted by the failure of the guidelines to take into account the extent to which the harm that was ultimately caused in this case was knowingly risked by Mr. Benskin. Over and over again Mr. Benskin confronted situations where people were making decisions to invest with him. Over and over again he took their money knowing that he was risking the loss of all of it by failing to invest all or part of it. For that reason the Court believes that upward departure is warranted.

> The second reason the Court believes that upward departure is warranted in this case is because of the number of

victims and the harm to those victims; in other words, the extent and the magnitude of the harm in this case warrants the upward departure. The victims in this case have sustained severe financial harm in many instances, and also in many instances emotional harm. We can all I'm sure imagine how an individual would feel who had lost his entire life savings through investing with Mr. Benskin, as a number of these victims did who have lost money that was intended for sending children to college, as many of these victims did. The Court finds, therefore, that an upward departure is warranted for the reasons stated.

Transcript of April 27, 1990 Sentencing Hearing.

Notwithstanding the district court judge's articulated sentencing rationale, the appellant argues that "the District Court's references to Benskin's risk of loss of his victims' money does not explain how a Guideline Range sentence was inadequate," Appellant's Brief at 9, adding that "there are no facts set forth in the record in any specific, articulative fashion that indicates that this crime was any more than an 'average' white-collar crime in which a stock scam or Ponzi scheme has been developed." *Id.* at 11. Benskin's assertions are belied by the record.

Though the Sentencing Guidelines consider the dollar amount of the loss, *see* U.S.S.G. § 2F1.1(b)(1)(K), and (very generally speaking) the number of people affected, *see* U.S.S.G. § 2F1.1(b)(2)(B) ("If the offense involved a scheme to defraud more than one victim...."), the Guidelines note that "[d]ollar loss often does not fully capture the harmfulness and seriousness of the conduct. In such instances, an upward departure may be warranted." U.S.S.G. § 2F1.1, comment. (n. 9). Moreover, the Guidelines provide:

> Empirical analyses of current practices show that the most important factors that determine sentence length are the amount of loss and whether the offense is an isolated crime of opportunity or is sophisticated or repeated....

The extent to which an offense is planned or sophisticated is important in assessing its potential harmfulness and the dangerousness of the offender, independent of the actual harm. A complex scheme or repeated incidents of fraud is indicative of an intention and potential to do considerable harm.

U.S.S.G. § 2F1.1, comment. (backg'd). Benskin's criminal activities continued for nearly five years resulting in the loss of over three million dollars to more than 600 investors. The district court judge correctly concluded that the psychological harm inflicted on these investors (including disabled and elderly individuals) is immeasurable. Therefore, because the "circumstances relied on by the district court ... are of a kind or degree that may appropriately be relied upon to justify departure," *United States v. Diaz–Villafane*, 874 F.2d at 49, we must proceed to the second prong of the *Diaz–Villafane* analysis.

### B.

■ The second *Diaz–Villafane* prong requires that we determine whether the "unusual" circumstances relied upon by the district court "actually exist[ed] in the particular case." *United States v. Diaz–Villafane*, 874 F.2d at 49. Because the uncontroverted facts in this action (as set forth in the presentence report and adopted by the district court judge), as well as Benskin's guilty plea to all fifty counts of the indictment, clearly satisfy this prong of the *Diaz–Villafane* analysis, we must next determine whether the "degree" of the district court's departure was reasonable. *See id.* ("[T]he direction and degree of departure must, on appeal, be measured by a standard of reasonableness.").

### C.

■ Having determined that departure was warranted, we must now consider whether the direction and degree of departure was reasonable. *United States v. Christoph*, 904 F.2d 1036, 1042 (6th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 713, 112 L.Ed.2d 702 (1991). Because "[t]rial judges are on the front line dealing

with real live defendants, and are in a far better position than appellate courts to determine the circumstances justifying an upward departure," *United States v. Joan*, 883 F.2d at 496, a "[district] court's discretion to depart from the Guidelines is broad." *United States v. Rodriguez*, 882 F.2d at 1068. "Necessarily, the trial judge's determination must be given great deference, and, unless there is little or no basis for the trial court's action in departing, it must be upheld, provided the trial court has recognized that departure is the exception, and has adequately articulated its reasons for departure." *United States v. Joan*, 883 F.2d at 496. Furthermore, the district court judge "must act in a rational and just way in an effort to vindicate one of the major purposes of the criminal law—deterrence, punishment, isolation, rehabilitation, or retribution." *Id.*

Though the district court judge in the instant action determined that the Sentencing Guidelines directed a 27 to 33 month sentence (offense level 18; criminal history category I), the judge departed from the guideline range and sentenced Benskin to 60 months due to the severity, and duration, of his crimes. This departure can hardly be deemed unreasonable in light of Benskin's crimes:

> The trial court, however, specifically stated that her decision to enhance Burns' sentence was based not simply on planning but upon the prolonged and repetitive nature of Burns' crime.... The court properly observed that in incorporating a "more than minimal planning" adjustment into the Guidelines, the Commission did not consider "the number of years and the amount of fraudulent transactions ... executed" by a defendant. Burns' crime involved 53 separate acts of theft over a six-year period. The trial judge could reasonably have concluded that the duration of *execution*, then, warranted enhancement. We note that a defendant who persists in his criminal activity over a period of years may

deserve a harsher sentence than a defendant whose crime was limited in duration because the former has arguably had more opportunities to renounce his illegal schemes. Accordingly, the trial court's finding that the duration of Burns' crime justified departure ... was not unreasonable.

*United States v. Burns*, 893 F.2d 1343, 1346 (D.C.Cir.) (emphasis in original), *cert. granted*, —— U.S. ——, 110 S.Ct. 3270, 111 L.Ed.2d 780 (1990). *See also United States v. Roberson*, 872 F.2d 597, 606 n. 7 (5th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 175, 107 L.Ed.2d 131 (1989) ("[T]he mere fact that a departure sentence exceeds by several times the maximum recommended under the Guidelines is of no independent consequence in determining whether the sentence is reasonable."). Accordingly, "the extent of the district court's departure from the Guidelines ... was within the realm of reason," *United States v. Diaz–Villafane*, 874 F.2d at 52, in the instant action.[1]

### III.

For the aforementioned reasons, we AFFIRM the district court's sentencing determination.

---

**1.** The government correctly maintains that *United States v. Kennedy*, 893 F.2d 825 (6th Cir.1990) (requiring that sentencing courts look to the next higher criminal history category as a reference before otherwise departing from the guidelines), is inapplicable to the instant action. *See id.* at 829 n. 6; U.S.S.G. § 4A1.3.