966 F.2d 1455
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James N. WILLIAMS (91-3713), Americo Argentieri (91-3714),
Defendants-Appellants.
 Nos. 91-3713, 91-3714.
 United States Court of Appeals, Sixth Circuit.
 June 22, 1992.
 
 Before NATHANIEL R. JONES and RALPH B. GUY, Jr., Circuit Judges, and KRUPANSKY, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The defendants appeal from their convictions for conspiracy to manufacture or deal in explosives without a license. The defendants also challenge the district court's decision to depart upward because of the destruction that resulted when a co-conspirator's illegal fireworks factory exploded. We affirm.
 
 I.
 
 2
 On October 24, 1989, a powerful explosion shook a residential neighborhood in Conneaut, Ohio. The blast and the resulting fireball killed two people, injured twelve others, destroyed four homes and one business, and damaged approximately seventy buildings. The explosion caused nearly $3,000,000 in property damage and cost the public more than $30,000 in fire control, police, and cleanup costs.
 
 
 3
 The local authorities quickly determined that the blast originated from the home of Donald Rossi, one of the two people who died in the explosion.[1] The police called in agents from the Bureau of Alcohol, Tobacco and Firearms (ATF) to examine the site. The agents determined that Rossi had been manufacturing "M80" explosive devices in the basement of his home. The agents reached that conclusion after finding M80s, glue guns, chemical residue, dust masks, and $23,000 in charred currency in the remains of the basement.
 
 
 4
 A few days later, the ATF received a tip from Louis DiPlacido, one of Rossi's former associates. The tip led the ATF to a storage shed in Erie, Pennsylvania, that Rossi had rented under a pseudonym. Inside the shed, the agents found more than 500,000 M80s, as well as chemicals and supplies used in their manufacture.
 
 
 5
 By tracing the records of some of the chemicals found in the shed, the ATF learned that Edward Vandermark of Seneca, Pennsylvania, had purchased large quantities of certain chemicals used to manufacture M80s. Through information supplied by Vandermark and DiPlacido and through subpoenaed phone records, the agents learned of and contacted several other people involved in Rossi's business, including the two appellants, Americo Argentieri and James Williams.
 
 
 6
 Argentieri, a resident of Buffalo, New York, helped Rossi's enterprise in several ways. According to DiPlacido, when Rossi and DiPlacido drove to Buffalo to sell fireworks to customers in the area, Argentieri allowed them to use his residence for the transactions and helped unload fireworks from Rossi's van. Argentieri supplied Rossi with glue guns and glue that were used to manufacture the M80s. Argentieri may also have helped Rossi obtain chemicals. On one occasion, Argentieri led Rossi and DiPlacido to a storage facility in Buffalo and loaded a black barrel onto Rossi's van. DiPlacido believed that the barrel contained perchlorate. Anthony Tamburo, a Pennsylvania resident, testified that Argentieri sold him hundreds of cases of M80s between 1985 and 1988.
 
 
 7
 Two months after the explosion, DiPlacido, who was cooperating with the authorities, placed a telephone call to Argentieri. During the recorded call, DiPlacido discussed the explosion and urged Argentieri to clean out the Buffalo storage unit before federal agents could search it. Argentieri replied, "I did it, I did it the following day." (App. 90).
 
 
 8
 ATF agents interviewed Argentieri in February 1990. Argentieri denied renting a storage unit and denied knowledge of any M80s. During a later visit to Argentieri's home, one of the agents photographed a black barrel outside of Argentieri's home. In September 1990, the ATF searched the Buffalo storage unit with the consent of the new tenant. The agents vacuumed dust from the floor and the walls of the unit and discovered that the dust contained perchlorate, potassium, and sulfur.
 
 
 9
 DiPlacido and Rossi also had customers in Michigan. In June 1989, DiPlacido and Rossi drove to Monroe, Michigan, to make some deliveries. DiPlacido delivered fireworks to Ed Verda, and Rossi delivered thirty boxes of fireworks to James Williams.
 
 
 10
 ATF Agent Larry Brock visited Williams during the investigation. Williams told Brock that he bought the fireworks for resale in the Detroit area. Williams discussed Rossi's manufacturing operation in detail and also mentioned that he had provided Rossi with some fuse. Records of the American Safety Fuse Company revealed that Williams purchased 100,000 feet of fuse in 1986 and 1987.
 
 
 11
 In January 1991, a grand jury returned an indictment against Argentieri, Williams, Vandermark, Verda, and two other persons. Count 1 charged the defendants with conspiring to manufacture or sell explosives without a license, in violation of 18 U.S.C. § 842(a)(1). Count 2 charged the defendants with substantive violations of section 842(a)(1).[2]
 
 
 12
 The case proceeded to trial in July 1991, and the jury convicted Argentieri, Vandermark, and Williams on both counts. The jury acquitted the two remaining defendants.
 
 
 13
 The probation department issued presentence reports indicating that all three defendants fell into Criminal History Category I. The reports concluded that Williams' offense level was 4 and that Argentieri's and Vandermark's offense level was 6. Under the guidelines, the applicable range for each defendant was 0 to 6 months imprisonment.
 
 
 14
 The district court notified the parties that it was considering an upward departure. The court then held a sentencing hearing, at which several witnesses testified about the devastating effects of the explosion in Conneaut. At the conclusion of the hearing, the court announced a 12-level upward departure for all three defendants, raising Argentieri and Vandermark to level 18 and Williams to level 16. The court arrived at 12 levels by adding 4 levels for the death of Mrs. Riddle, 4 levels for the extensive property damage, 2 levels for the physical injuries suffered by survivors of the blast, and 2 levels for the disruption of Conneaut's city services.
 
 
 15
 The district court sentenced each defendant to the bottom of his new guideline range: 27 months for Vandermark and Argentieri, and 21 months for Williams. Argentieri and Williams filed these appeals, and the district court stayed their sentences pending our review. Vandermark did not appeal his conviction or sentence.
 
 II.
 
 16
 Argentieri and Williams argue that their convictions should be reversed. Both maintain that the district court erred by allowing the government to introduce a chart summarizing phone calls, chemical purchases, and other events involving Rossi and his associates. Argentieri also argues that the court erred by admitting evidence concerning the rental storage unit in Buffalo. Each defendant contends that the evidence was insufficient to support his conviction. We examine these arguments in turn.
 
 A.
 
 17
 Both Williams and Argentieri contend that the district court erred by allowing the government to introduce a summary chart. The chart covered the period from January 1987 to October 1989 and contained a chronological listing of events, including: (1) approximately 300 telephone calls made between the homes of the alleged members of Rossi's enterprise; (2) 18 purchases of chemicals by Vandermark; (3) seven purchases of glue and glue guns by Tamburo; (4) two purchases of treasurer's checks by Vandermark; (5) the rental of the storage unit in Erie; and (6) the explosion in Rossi's basement.
 
 
 18
 The district court admitted the summary chart under Fed.R.Evid. 1006, which allows a party to present voluminous records in summary form. "The admission of summaries under Rule 1006 is committed to the sound discretion of the trial court." Gomez v. Great Lakes Steel Div., 803 F.2d 250, 257 (6th Cir.1986). Therefore, our review is limited to determining whether the district court abused its discretion. See United States v. Campbell, 845 F.2d 1374, 1381 (6th Cir.), cert. denied, 488 U.S. 908 (1988).
 
 
 19
 Argentieri and Williams argue that the admission of the chart allowed the prosecution to introduce hundreds of calls and transactions without establishing the foundation for their admission. This contention is meritless. The defendants stipulated to the authenticity of the telephone records, and the government introduced business records to establish the existence of the other transactions listed on the chart. The relevance of the phone calls was established by their temporal proximity to each other and to the dates of purchases of the chemicals and supplies.
 
 
 20
 Williams and Argentieri also contend that the chart was argumentative, misleading, and amounted to an extra summation for the government. The district court sustained defense objections to several argumentative items in the government's original version of the chart. The government then removed these items or eliminated their argumentative aspects. The chart that the jury actually considered contained a chronological list of events presented in neutral language.
 
 
 21
 We have long recognized the danger that a jury in a criminal case may rely too heavily on a summary chart, and we have required judges to instruct juries that a chart is not itself evidence but is only an aid in evaluating the evidence. United States v. Scales, 594 F.2d 558, 564 (6th Cir.), cert. denied, 441 U.S. 946 (1979). The district court in this case so instructed the jury. Since the chart contained objective information presented in neutral language and since the court cautioned the jury as to its use, the chart was properly admitted under Rule 1006. Id.
 
 
 22
 Finally, Argentieri and Williams argue that the district court should have excluded most of the telephone calls listed in the chart as more prejudicial than probative. See Fed.R.Evid. 403. First, they point out that most of the calls did not involve them and were not included as overt acts in the indictment. Even so, the calls were relevant to prove the existence of the conspiracy. The acts of alleged co-conspirators occurring even before the period under indictment are admissible to prove the existence of the conspiracy. See United States v. Aguirre Aguirre, 716 F.2d 293, 297-98 (6th Cir.1983).
 
 
 23
 Argentieri and Williams also point out that the government could not establish who spoke during each phone call and that many of the phone calls were of such short duration that the person called could not have been home. These objections go to the weight to be given to the phone records, not their admissibility. Rule 403 requires the court to exclude only evidence that is unfairly prejudicial. United States v. Rey, 923 F.2d 1217, 1222 (6th Cir.1991). Since we find nothing unfairly prejudicial in the telephone records, the district court properly admitted this evidence.
 
 B.
 
 24
 Argentieri also contends that the district court erred in admitting certain evidence against him. Specifically, Argentieri argues that the chemical dust from the rental storage unit was inadmissible because the government could not match his signature to the one on the lease and because the ATF found the dust after another tenant had rented the unit.
 
 
 25
 Once again, these arguments go to the weight to be given to the evidence, not its admissibility. In addition, the government introduced ample evidence to connect Argentieri to the storage unit. For example, DiPlacido testified that he accompanied Rossi and Argentieri to the unit and watched Argentieri load a black barrel onto Rossi's van. We find that the district court did not err in admitting this evidence.[3]
 
 C.
 
 26
 Both defendants argue that the government failed to introduce sufficient evidence to support their convictions. When reviewing a sufficiency of evidence claim, we must view the evidence in the light most favorable to the government and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979).
 
 
 27
 Turning first to Argentieri, DiPlacido testified that Argentieri helped Rossi deliver M80s to customers in the Buffalo area, and that he also delivered glue, glue guns, and chemicals to Rossi. The physical evidence from the Buffalo storage unit also supports a finding that Argentieri stored chemicals or fireworks in Buffalo. Tamburo testified that Argentieri sold him thousands of M80s from 1985 to 1988. Tamburo also testified that he sold glue and glue guns to Argentieri.
 
 
 28
 From this evidence, a rational juror could conclude that Argentieri participated in the manufacturing and sale of explosives without a license and that he conspired with others to do so. We therefore affirm Argentieri's convictions.
 
 
 29
 As to Williams, DiPlacido testified that he observed Rossi deliver a large quantity of M80s to Williams. ATF Agent Brock testified that Williams admitted to buying M80s for resale in the Detroit area and to giving fuse to Rossi. Brock also testified that Williams gave him detailed information about Rossi's basement manufacturing operation. The government introduced testimony and documents to establish that Williams had bought large quantities of fuse from a supplier.
 
 
 30
 Williams argues that he cannot be convicted of selling explosives because there is no evidence that he engaged in multiple transactions. See United States v. Tarr, 589 F.2d 55, 59 (1st Cir.1978). However, we have held that the "single-sale defense" is available only if the buyer and seller are the only two participants or the buyer is a minor figure who is unaware of the scope of the enterprise. United States v. Hamilton, 689 F.2d 1262, 1272 (6th Cir.1982), cert. denied, 459 U.S. 1117 (1983).
 
 
 31
 According to Brock, Williams was aware of others involved in Rossi's enterprise and had detailed knowledge of Rossi's manufacturing operation. Williams was not merely a buyer of Rossi's product, but also admitted to reselling the fireworks in the Detroit area. Therefore, a rational jury could conclude that Williams dealt in fireworks and conspired with others to do so. Finally, since Williams admitted to supplying fuse to Rossi, the jury also could have concluded that Williams participated in the manufacturing of illegal explosives. Accordingly, we affirm Williams' convictions.
 
 III.
 
 32
 Williams and Argentieri both challenge the district court's decision to depart upward from their applicable sentencing guideline ranges. We apply a three-part test when reviewing upward departures:
 
 
 33
 (1) whether the case is sufficiently unusual to warrant departure (a question of law reviewed de novo ); (2) whether the circumstances warranting departure actually exist in the particular case (a question of fact reviewed under the clearly erroneous standard); and (3) whether the departure is reasonable.
 
 
 34
 United States v. Lassiter, 929 F.2d 267, 270 (6th Cir.1991). Argentieri and Williams maintain that the departures in this case fail all three parts of the test.
 
 
 35
 First, they argue that the sentencing guidelines for explosives violations already took into account the threat to public safety. The background to the guideline in effect at the time the defendants were sentenced stated:
 
 
 36
 This section applies to conduct ranging from violations of a regulatory nature pertaining to licensees or persons otherwise lawfully involved in explosives commerce to more serious violations that involve substantial danger to public safety.
 
 
 37
 U.S.S.G. § 2K1.3, comment. (backg'd.) (emphasis added)[4]. Argentieri and Williams argue that an upward departure is not authorized because this language indicates that the Sentencing Commission considered the threat to the public when setting the guideline level.
 
 
 38
 We agree with the defendants that the background commentary appears to foreclose a district court from departing upward merely to reflect the danger to the public inherent in the manufacture and distribution of illegal explosives. But see United States v. Dempsey, 957 F.2d 831, 834 (11th Cir.1992) (affirming upward departure to reflect danger to public inherent in manufacture of pipe bombs in residential neighborhood); United States v. Huddleston, 929 F.2d 1030, 1032 (5th Cir.1991).
 
 
 39
 In this case, however, the court departed upward to reflect the actual harm done by the defendants' operation. The guidelines generally allow a sentencing court to depart upward when a threatened harm actually materializes. See U.S.S.G. § 5K2.1 (death), § 5K2.2 (physical injury), § 5K2.5 (property damage), and § 5K2.7 (disruption of government). Therefore, a district court may depart upward from the guideline range prescribed in section 2K1.3 when the "substantial danger to public safety" actually results in harm to the public.
 
 
 40
 Turning to the second part of our test for upward departures, Argentieri and Williams argue that there was no nexus between their conduct and the explosion in Conneaut. We review for clear error the district court's conclusion that the defendants' conduct was sufficiently connected to the explosion. Lassiter, 929 F.2d at 270.
 
 
 41
 Both Williams and Argentieri argue that, as mere distributors, they are not criminally responsible for an accident that occurred during the manufacturing process. We disagree. Both men were active participants in Rossi's scheme and both were aware that Rossi was manufacturing large quantities of dangerous explosives in his basement in a residential neighborhood. Conspirators are criminally liable for the acts of their co-conspirators that are reasonably foreseeable and in furtherance of the conspiracy. United States v. Christian, 942 F.2d 363, 367 (6th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 905 (1992). Therefore, the district court did not commit clear error in holding Argentieri and Williams partially responsible for the explosion.
 
 
 42
 Even if we were to accept the defendants' invitation to draw a line between the manufacturer and his distributors, we would find that Argentieri and Williams are on the wrong side of the line. Williams provided Rossi with fuse, and Argentieri supplied glue, glue guns, and, apparently, chemicals to the operation. Therefore, Argentieri and Williams were active participants in the manufacturing process.
 
 
 43
 Having concluded that the explosion and its effects could serve as a ground for upward departures, we now must consider whether the departures were reasonable. Since a trial judge deals with flesh and blood defendants and is in a better position than an appellate court to determine the circumstances justifying an upward departure, we give broad deference to a district court's departure decision. United States v. Benskin, 926 F.2d 562, 566-67 (6th Cir.1991).
 
 
 44
 In this case, the district court concluded that the sentencing guidelines failed to reflect the magnitude of the offense. The court began its analysis by comparing the prescribed offense level, 6, with the level for several other crimes, including arson (level 24), negligent involuntary manslaughter (level 10), reckless involuntary manslaughter (level 14), and aggravated assault (level 17). The court rejected an analogy to voluntary manslaughter (level 25), stating: "The deaths in this case equate with involuntary manslaughter. Voluntary manslaughter requires an intent to kill and there is no evidence of an intent to kill in this case." (App. 66).
 
 
 45
 The court then decided to add 12 levels to each defendant's offense level. The court arrived at 12 levels by adding 4 levels for the death of Mrs. Riddle, 4 levels for the property damage, 2 levels for the injuries to survivors, and 2 levels for the disruption of Conneaut's city services.
 
 
 46
 We note that "18 U.S.C. § 3553(b) contemplates a departure from the guidelines rather than an increase in the offense level for factors not adequately considered." United States v. Guarin, 898 F.2d 1120, 1123 (6th Cir.1990). When a district court departs upward by increasing the offense level, we review the reasonableness of the departure by examining the sentence actually imposed. Id.
 
 
 47
 Argentieri and Williams maintain that the degree of departure was unreasonable. They argue that they were, at most, peripheral figures in Rossi's conspiracy. Unlike Vandermark, who supplied tons of explosive chemicals to Rossi, Argentieri and Williams appear to be primarily distributors. As we indicated above, however, both men supplied goods that Rossi used in the manufacturing process.
 
 
 48
 Argentieri and Williams contend that the district court's increase of 12 offense levels is, on its face, unreasonable. See United States v. Phillip, 948 F.2d 241, 254 (6th Cir.1991) ("Only highly unusual circumstances can justify an upward departure equivalent to three offense levels."), petition for cert. filed, No. 91-7152 (Jan. 28, 1992). Looking to the sentences actually imposed, Argentieri received a sentence four and one-half times longer and Williams three and one-half times longer than the maximum sentences available before the departures. This translates to a 21-month departure for Argentieri and a 15-month departure for Williams.
 
 
 49
 The severity of the departures imposed in this case depends, in part, whether one views the departures in relative or absolute terms. We repeatedly have approved upward departures of more than 21 months. See, e.g., Benskin, 926 F.2d at 567 (approving 27-month departure); United States v. Pulley, 922 F.2d 1283, 1289 (6th Cir.) (approving 42-month departure), cert. denied, --- U.S. ----, 112 S.Ct. 67 (1991). Although departures that result in sentences more than three times greater than that authorized by the guidelines are rare, there is no per se rule against such departures. Benskin, 926 F.2d at 567.
 
 
 50
 Here, the district court began its analysis by comparing the defendants' conduct to other crimes, and found that the conduct most resembled involuntary manslaughter. Although the court did not state explicitly that it was linking the departures to the guideline for involuntary manslaughter, we observe that Williams's and Argentieri's "adjusted" offense levels were only 2 and 4, respectively, above the base offense level for reckless involuntary manslaughter.
 
 
 51
 We find it appropriate to equate the defendants' role in the death of Mrs. Riddle to reckless involuntary manslaughter. We also agree that further upward departures are warranted to reflect the extensive property damage, the injuries to the blast survivors, and the disruption of Conneaut's city services. Looking to the sentences actually imposed, Guarin, 898 F.2d at 1123, we cannot say that the upward departures in this case were unreasonable. Accordingly, we affirm the defendants' sentences.
 
 
 52
 AFFIRMED.
 
 
 
 [1]
 The other fatality was Rossi's next door neighbor, Mrs. Riddle
 
 
 [2]
 Counts 3 and 4 charged Williams and Verda, respectively, with transporting illegal explosives in interstate commerce, in violation of 18 U.S.C. § 842(a)(3)(A). The court dismissed Count 3 against Williams before trial. Verda failed to appear for his arraignment and was not apprehended until shortly before the trial was scheduled to begin. The court then ordered Verda to stand trial separately
 
 
 [3]
 Argentieri also complains about the admission of a photograph, taken by ATF agent Brock, of a black barrel standing outside of Argentieri's home. Since DiPlacido testified that Argentieri delivered a black barrel to Rossi, the photograph is clearly relevant and admissible
 
 
 [4]
 A district court ordinarily must apply the version of the guidelines in effect at the time of sentencing, not at the time of the offense as the government suggests. See United States v. Williams, 940 F.2d 176, 181 (6th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 666 (1991). The Sentencing Commission made no significant changes in section 2K1.3 between the time of the offense and the sentencing in this case. In November 1991, the Sentencing Commission deleted section 2K1.3 in its entirety and replaced it with new language. Among other changes, the new guideline increased the base offense level from 6 to 12