**UNITED STATES of America**

v.

**William M. STROUSE, III.**

No. 4:CR–94–0079.

United States District Court,
M.D. Pennsylvania.

April 17, 1995.

**1462**

George Rocktashel, Asst. U.S. Atty., Williamsport, PA, for the U.S.

G. Scott Gardner, Williamsport, PA, for defendant.

## OPINION

MUIR, District Judge.

### I. Introduction.

On April 15, 1994, a 10–count information was filed charging William M. Strouse, III, with one count of wire fraud and nine counts of interstate transportation of stolen monies. On May 10, 1994, Strouse entered a plea of guilty to the information.

In the presentence report the Probation Officer calculated a total offense level of 18 and a criminal history category of III resulting in a guideline imprisonment range of 33 to 41 months.

At the presentence conference on July 27, 1994, we determined that it was necessary to hold a presentence hearing. The presentence hearing was originally scheduled for September 26, 1994. After Strouse withdrew his objections to the presentence report, we canceled the presentence hearing and scheduled Strouse's sentencing for October 4, 1994.

On October 4, 1994, we notified Strouse in open court and issued an order stating that we were considering an upward departure pursuant to U.S.S.G. § 5K2.0 because of possible aggravating circumstances not taken into consideration by the sentencing Commission. Those circumstances involved the number of victims and the psychological impact of Strouse's fraud on them. Strouse defrauded 15 victims, some of whom may have been particularly vulnerable, of $369,842.49 in toto.

On March 24, 1995, we held a presentence hearing on whether the number of victims and the extreme psychological impact of Strouse's fraud upon some of those victims justified an upward departure from the guideline range. The following are the Court's findings of fact, discussion, and conclusions of law with regard to the issues raised.

### II. Findings of Fact.

1. While a Prudential agent, Strouse misrepresented to the fifteen (15) victim investors that he would invest their money in annuities and stock funds, and thereby fraudulently obtained a total of approximately $369,842.49 from them. (Undisputed, hereafter "U")

2. Purporting to invest the funds on their behalf, Strouse obtained checks from the victims payable to Prudential. (U)

3. Strouse then went to Commonwealth Bank in Lock Haven, and used the victims' checks to purchase numerous cashier's checks in amounts ranging from a few thousand dollars up to $12,000.00. (U)

4. Strouse mailed the cashier's checks to Prudential Bank and Trust in Georgia as payments on the credit card account that he maintained there. (U)

5. A small portion of the monies were legitimately invested in Prudential products, but most of the money was used to open multiple insurance accounts and make premium payments for other Prudential customers (other than the victims), which had the effect of inflating Strouse's sales statistics and making him one of the national sales leaders for Prudential out of an unlikely Clinton County venue. (U)

6. Other monies were used to make premium payments on insurance policies in danger of lapsing, in order to avoid commission losses. (U)

7. Strouse received commissions based on new business generated and on a percentage of premiums paid on accounts. (U)

8. Unbeknownst to the victims and without their permission, Strouse fraudulently converted $189,516.36 of the monies given to him for investments by running them through his credit card account at Prudential Bank and Trust and by depositing some of the monies into his Prudential money market account.

9. Instead of investing the money as he had told the victims he would do, Strouse took funds, totalling $169,404.95, and used

them to make payments on his credit card account which had the effect of increasing his credit line.

10. Strouse used $20,111.41 to open a money market account and spent the money on various personal expenses. (U)

11. At one point, he was running an approximately $15,000.00 credit on his charge account. (U)

12. Strouse also mailed a cashier's check in the amount of $20,111.41 to Prudential Bank and Trust in Georgia for deposit into the money market account that he opened there. (U)

13. Then, without the victims' knowledge or consent, Strouse wrote checks on the money market account to pay his mortgage and to purchase an audio appliance business in Lock Haven and its inventory. (U)

14. Strouse then gained use of the converted monies moved through the credit card account by drawing numerous cash advances against it at Commonwealth Bank in Lock Haven. (U)

15. Strouse used the cash advances for his own benefit, and opened and paid premiums on other customer's investment accounts.

16. Strouse also used some victims' money to pay a return to other victims. (U)

17. The cash advances obtained by Strouse in Lock Haven resulted in several types of wire transmissions nationwide: the wire transfer of monies from Prudential Bank and Trust in Georgia to Commonwealth Bank in Williamsport; telephone calls for account authorization by Commonwealth Bank employees in Lock Haven to credit card processors in New York and Nebraska; and telephonically transmitted electronic account verification from New York and Nebraska to the credit card company in Virginia and Georgia. (U)

18. Strouse admitted during an FBI interview that he made false representations and promises to the victims about how he was going to invest their money. (U)

19. Strouse admitted that he never told the victims that he planned to convert a sizable portion of their investment into cash-

ier's checks and use them for his own benefit by increasing his credit line on his credit card account so that he could utilize the funds in the form of very large cash advances. (U)

20. Strouse acknowledged obtaining the cashier's checks, and mailing them out of state to the bank administering his credit card account. (U)

21. Strouse admitted that the monies he took as cash advances consisted almost exclusively of the monies fraudulently obtained from the victims and recast as cashier's checks for his own personal use and benefit. (U)

22. The mailing of the cashier's checks from Pennsylvania to Georgia and Virginia for credit against the credit card account and for deposit into the money market account gave rise to the nine counts of Interstate Transportation of Stolen Monies in the information.

23. The information charges that nine cashier's checks exceeding $5,000.00 were mailed within the limitations period. Those checks totalled $100,933.20.

24. The victims' names and addresses, as well as their losses, are identified in the attached schedule (Appendix 1), summarizing the transactions charged in the information. Appendix 1 is incorporated herein by reference.

25. When interviewed by the probation officer, Mr. Strouse acknowledged his participation in this offense. (U)

26. Strouse reported that he used some of the stolen funds to pay insurance premiums for customers unable to afford them, and advised that manipulating funds in this way is a common practice among Prudential insurance agents. (U)

27. Strouse accepted responsibility for his conduct and noted that he received benefits through increased commissions and status within the company. (U)

28. The total number of victims is 15, 6 of whom range in age from 60 to 93 years.

29. Strouse defrauded many of the elderly victims, including Janet and Richard Sai-

ers, Donald Gottshall, and Glenn and Estella Probst, of the savings and investments that they planned to live on during their retirement years. (U)

30. The Spitzer family suffered mental strain and emotional anxiety.

31. Michael Spitzer returned home early from a business trip to Texas because special agents from Prudential were visiting his home to investigate their dealings with Strouse.

32. Strouse told Michael and Janet Spitzer in front of their children that he had threatened people with guns in the past.

33. Janet Spitzer became physically sick and was prescribed anti-depression and anti-anxiety medication because of Strouse's criminal acts.

34. The Spitzers visited a minister and a family therapist at least in part because of Strouse.

35. Eleanor R. Miller, who is 59 years old, lost $6,000.00 in her dealings with Strouse. She will be unable to retire at age 60 because of her $6,000.00 loss.

36. Estella Probst, 84 years old, and her husband Glenn Probst, 93 years old, invested $58,482.56 with Prudential at Strouse. They now have no income other than social security and a pension.

37. Richard Saiers and Donald Gottshall were required because of their losses to cancel their retirement plans after years of work and must continue to work to sustain themselves.

38. Donald Gottshall, who is 63 years old, entrusted $7,500.00 to Strouse for investment purposes. This money represented Gottshall's retirement savings. His current loss is $7,500.00.

39. Gottshall is living on social security and earnings from part-time employment.

40. Richard and Janet Saiers entrusted $189,329.83 to Strouse for investment purposes. This amount represented the Saiers's entire retirement savings. The Saiers's current loss is $189,329.83.

41. Strouse visited the Saiers on a daily basis and described himself as their financial advisor.

42. The Saiers stated that they suffered from mental strain, nervous tension, and sleeplessness as a result of losing their retirement funds.

43. On August 7, 1988, Adelia Workman entrusted Strouse with $10,000.00 to invest on her behalf.

44. Strouse opened an account at Prudential in the name of Adelia Workman using money converted from funds given to him by the Saiers. Strouse retained Workman's $10,000.00 for his own use.

45. Strouse redeemed Workman's Prudential account. Workman received a check in the amount of $8,571.62. The check represented the redemption of an initial $10,000 investment with Prudential less a penalty for early withdrawal.

46. Workman deposited the check in the amount of $8,571.62 into her checking account.

47. Workman then wrote a check payable to Strouse in the amount of $8,571.62 for him to invest on her behalf.

48. Workman cashed in an Individual Retirement Account ("IRA") in the approximate amount of $8,610.00, and entrusted that amount to Strouse to invest on her behalf.

49. Strouse told Workman that he was going to invest $8,610.00 in an insurance account with Mutual of Ohio.

50. Strouse subsequently gave $3,000.00 in cash to Workman to replace monies that he purportedly invested on her behalf.

51. Workman lost a total of $15,610.00 representing funds purportedly invested by Strouse on her behalf. Workman's loss from her dealings with Strouse while he was employed by Prudential was $1,428.38.

52. Adelia Workman lost her home as a result of Strouse's malfeasance, one of her principal assets.

53. Shirley Decker, the aunt of Strouse's wife, advanced to Strouse $42,030.10 to invest in an alleged "cluster" fund with the Saiers

and the Probsts. Her current loss is approximately $27,000.00.

54. Decker assumed she would live on this money during her retirement years. Decker now lives on social security and a modest pension.

55. Strouse's criminal acts have ruined Decker's relationship with her closest sister, the mother of Strouse's wife.

56. Apart from the physical, psychological and emotional effects of their losses, many of the victims lost their life savings on which they planned to live for the rest of their lives.

### III. Discussion.

The Sentencing Reform Act of 1984 authorizes a sentencing court to depart from the range imposed by the Sentencing Guidelines where "... the Court finds that there exists an aggravating ... circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C. § 3553(b).

■ In Paragraph 22 of the presentence report, the Probation Officer determined that Strouse's offense involved more than minimal planning and a scheme to defraud more than one person and applied a 2–level increase to his base offense level under § 2F1.1(b)(2) of United States Sentencing Guidelines.

In *United States v. Benskin,* 926 F.2d 562 (6th Cir.1991), the defendant defrauded more than 600 individuals of approximately $3,000,000 over a 5 year period. This scheme resulted in a loss of approximately $5,000 per victim. The Court of Appeals for the Sixth Circuit affirmed the sentencing court's upward departure pursuant to § 2F1.1. The Court of Appeals held that an upward departure was warranted pursuant to § 2F1.1 if the dollar loss does not capture fully "... the harmfulness and seriousness of the conduct." *Benskin,* 926 F.2d at 566. In *Benskin,* the sentencing court departed upwards from a guideline imprisonment range of 27 to 33 months and sentenced the defendant to a 60 month term of imprisonment.

Section 2F1.1(b)(2) does not take into consideration adequately the fact that Strouse's scheme beginning on January 14, 1988, and ending on September 30, 1991, defrauded 15 victims of approximately $369,842.49. This represents an average loss of $24,656.17 per victim. In many instances, Strouse repeatedly solicited money from the victims in order to continue his fraudulent scheme. The devastating impact of these losses on multiple victims is not adequately addressed by a 2–level increase pursuant to § 2F1.1(b)(2).

■ Application Note 10(f) to § 2F1.1 states that an upward departure may be warranted if the loss determined pursuant to § 2F1.1 does not consider adequately that the offense involved ... the knowing endangerment of the solvency of one or more victims.

Shirley Decker is reduced to living on social security and a modest pension. Adelia Workman was forced to sell her house and pay her bills with the sales proceeds because Strouse defrauded Workman of her retirement savings. Eleanor Miller, Glenn and Estella Probst, and Donald Gottshall must now survive on social security payments.

We are of the view that Strouse's offense involved the knowing endangerment of the insolvency of one or more victims and an upward departure is warranted pursuant to Application Note 10(f) of § 2F1.1.

■ In Paragraph 23 of the pre-sentence report, the Probation Officer applied a 2–level increase to Strouse's offense level pursuant to U.S.S.G. § 3A1.1. Section 3A1.1 permits an upward adjustment of 2 levels based on the vulnerability of the victim.

In *United States v. Kaye,* 23 F.3d 50 (2d Cir.1994), the Defendant was convicted of defrauding his great-aunt of her life savings, $893,700 in toto. The defendant had a total offense level of 19 and a criminal history category of I. The sentencing court departed upwards 2 levels and sentenced the defendant to 42 months in prison. The Court of Appeals for the Second Circuit affirmed the sentencing court's upward departure pursuant to § 3A1.1 because the defendant's victim was "susceptible to the criminal conduct" and

§ 3A1.1 does not adequately account for the harm suffered by the victim. *Id.* at 53.

The 2–level increase pursuant to § 3A1.1 does not address adequately the number of vulnerable victims affected by Strouse's criminal offense. Strouse's fraudulent scheme affected 15 victims, 6 of whom ranged in age from 60 to 93 years.

Strouse has known the Saiers for years as he went to school with their children. Strouse visited the Saiers on a daily basis and told them he was their "financial advisor." The Saiers relied on their long friendship with Strouse when entrusting him with their retirement savings. Adelia Workman lost her principal asset, her home and is using the proceeds from the sale of her home to sustain herself. The individual victims were unsophisticated investors who placed their trust in Strouse to make prudent investment decisions on their behalf. The impact of these losses on multiple vulnerable victims is inadequately addressed by § 3A1.1.

U.S.S.G. § 5K2.3 allows for a departure from the guideline range if the victims of a crime suffered "... psychological injury much more serious than that normally resulting from the commission of the offense...." The amount of the departure should be based on the extent to which the injury was intended or knowingly risked and the severity of the injury.

In *United States v. Astorri*, 923 F.2d 1052, 1058–59 (3d Cir.1991), the defendant, while employed as a stockbroker, defrauded multiple victims of approximately $360,000. The sentencing court departed upwards 2 levels pursuant to § 5K2.3 because the defendant inflicted extreme psychological injury on his victims. The Court of Appeals for the Third Circuit affirmed the departure.

Application Note 10(c) to § 2F1.1 states that in cases in which the loss determined under § 2F1.1(b)(1) does not fully capture the harmfulness and seriousness of the conduct an upward departure may be warranted where the offense caused reasonably foreseeable, physical, or psychological harm or severe emotional trauma.

Strouse inflicted severe mental strain and emotional anxiety on the Spitzer family. The Spitzers' children refused to leave their house for a period of time after Strouse discussed his gun collection in the presence of the children. Mrs. Spitzer was prescribed anti-depression and anti-anxiety medication in August, 1989, because of her dealings with Strouse.

Shirley Decker stated that her relationship with her closest sister, Strouse's wife's mother, was destroyed by Strouse's fraudulent scheme.

Mr. and Mrs. Saiers have suffered sleepless nights and have had their retirement plans ruined because Strouse defrauded them of their entire retirement fund. Mr. and Mrs. Saiers trusted Strouse as a longtime family friend and as a financial advisor.

We are of the view that an upward departure is warranted pursuant to § 5K2.3 because the guidelines do not adequately address the harmfulness and seriousness of Strouse's conduct or the severe psychological injury suffered by the victims. The effect of Strouse's criminal conduct upon the victims cannot be measured in dollars alone and are not adequately reflected in the guideline range set forth in the presentence report.

### IV. Conclusions of Law.

1. The large number of victims is inadequately addressed by § 3A1.1. An upward departure for the multiple victims is warranted.

2. The impact of the losses of multiple vulnerable victims is inadequately addressed by § 3A1.1. An upward departure for multiple vulnerable victims is warranted.

3. The physical, psychological and emotional effects of Strouse's fraudulent scheme justifies an upward departure under Application Note 10(c) to U.S.S.G. § 2F1.1.

4. The dollar loss suffered by the victims does not fully reflect the harmfulness and seriousness of Strouse's criminal offense.

5. The offenses involved the knowing endangerment of the solvency of one or more victims and justifies an upward departure under Application Note 10(f) accompanying § 2F1.1 of the Guidelines.

6. An upward departure of 3 levels represents the fair and just vehicle for remedying

the impact of Strouse's criminal activity on the victims and the inadequacy of the Guidelines.

7. An upward departure of 3 levels results in a total offense level of 21.

8. Based on a total offense level of 21 and a Criminal History Category III, the guideline imprisonment range is 46 to 57 months.

An appropriate order will be entered.

*ORDER*

1. The guideline imprisonment range is increased by 3 levels to a range of 46 to 57 months.

2. Sentence will be imposed on Defendant William M. Strouse, III, in Williamsport, on May 5, 1995, at 4:00 p.m.

## APPENDIX 1

UNITED STATES v. WILLIAM M. STROUSE, III

SUMMARY OF VICTIM LOSSES

| Age | | Victim Name | Victim Checks to Strouse[1] | Check Date | Pay Strouse Credit Card | Prudential Deposits/ Non–Victim Premiums | Prudential Deposits/ Unknown Account | Deposit to Prudential Account Controlled By Strouse | Victim Loss | Funds Replaced | Victim's Current Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Unk | A. | Shirley Decker | 28745.88 | 02/16/88 | 2548.94 | 2470.00 | 23726.94 | | 28745.83 | — | 28745.83 |
| | | | 13284.22 | 10/31/88 | 12344.22 | | 440.00 | | 13284.22 | | 13284.22 |
| 63 | B. | Richard Saiers | 12000.00 | 05/06/88 | 3000.00 | | 9000.00 | | 12000.00 | — | 12000.00 |
| 62 | | Janet Saiers (wife) | 98468.00 | 06/28/88 | 24690.00 | 10000.00 | 63778.00 | | 98468.00 | | 98468.00 |
| | | | 19315.57 | 01/27/89 | 12000.00 | | 7315.57 | | 19315.57 | | 19315.57 |
| | | | 15611.50 | 05/18/89 | 9000.00 | | 6611.50 | | 15611.50 | | 15611.50 |
| | | | 23934.76 | 09/05/89 | 15000.00 | | 8934.76 | | 23934.76 | | 23934.76 |
| | | | 20000.00 | 06/10/89 | 6000.00 | | 14000.00 | | 20000.00 | | 20000.00 |
| 63 | C. | Donald L. Gottshall | 7500.00 | 05/23/88 | 6000.00 | | 1500.00 | | 7500.00 | | 7500.00 |
| Unk | D. | Evelyn K. Draucker | 10000.00 | 09/21/88 | 6000.00 | | 4000.00 | | 10000.00 | 10000.00 | 00.00 |
| 58 | E. | Adelia G. Workman | 10000.00 | 08/05/88 | 10000.00 | | | | 10000.00 | 10000.00[2] | 00.00 |
| 73 | F. | Jeanne Charnesky | 3000.00 | 10/26/88 | 2000.00 | | 1000.00 | | 3000.00 | 3000.00 | 00.00 |
| 48 | G. | Gary L. Wolfe | 3500.00 | 03/07/89 | 3500.00 | | | | 3500.00[3] | 3500.00 | 00.00 |
| 93 | H. | Glenn Probst | 10688.23 | 04/12/89 | 10688.23 | | | | 10688.23 | | 10688.23 |
| 84 | | Estella Probst (wife) | 12444.05 | 07/07/89 | 11444.05 | | 1000.00 | 20111.41 | 12444.05 | | 12444.05 |
| | | | 23230.16 | 09/13/89 | | 3118.75 | | | 23230.16 | | 23230.16 |
| | | | 12120.12 | 05/31/89 | 8265.03 | | 3855.09 | | 12120.12 | | 12120.12 |
| 41 | I | Michael Spitzer Janet Spitzer (wife) | 20000.00 | 06/06/89 | 8500.00 | 5500.00 | | | 14000.00 | 14000.00 | 00.00[4] |
| 24 | J. | Russel Powers, Jr. | 20000.00 | 07/26/89 | 11924.48 | 8075.52 | | | 20000.00 | 20000.00 | 00.00 |
| 59 | K. | Eleanor R. Miller Kathy Lewis (Daughter) | 6000.00 | 08/19/89 | 6000.00 | | | | 6000.00 | | 6000.00 |
| | | Totals | 369842.49 | | 169404.95 | 29164.27 | 145161.86 | 20111.41 | 363842.49 | 60500.00 | 303342.49 |

1 Checks were made payable to "Prudential."

2 Funds replaced by theft from another victim, Richard & Janet Saiers.

3 Restitution made by Prudential.

4 Credit to victim's Prudential account in amount of $6,000.00.