**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Lloyd NELSON, Defendant–Appellee.**

No. 89–5270.

United States Court of Appeals,
Sixth Circuit.

Argued March 16, 1990.

Decided Nov. 20, 1990.

Steven H. Cook, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Chattanooga, Tenn., for plaintiff-appellant.

Richard K. Mabee (argued), Chattanooga, Tenn., for defendant-appellee.

Before WELLFORD and RYAN, Circuit Judges, and EDWARDS, Senior Circuit Judge.

RYAN, Circuit Judge.

The government appeals from defendant's sentence imposed pursuant to the United States Sentencing Commission's Sentencing Guidelines ("the guidelines"). We are asked to review the district court's downward departure from the guidelines for the stated purpose of imposing upon defendant a sentence "in line" with sentences imposed upon his co-conspirators.

We conclude that, while such a departure may be permitted under the guidelines in some circumstances, it was not proper in this case. We shall, therefore, vacate the sentence imposed and remand for resentencing.

I.

On November 3, 1988, a jury convicted Lloyd Nelson on one count of conspiracy to manufacture methamphetamine, in violation of 21 U.S.C. § 846. Nelson had participated in a Tennessee-based methamphetamine manufacturing operation by transporting cash from Montana to Tennessee for the chief conspirator. Nelson also worked as an armed guard/receptionist at the laboratory where the illicit drug was manufactured. In March 1988, officials of the Drug Enforcement Administration ("DEA") broke up the operation and arrested Nelson along with co-conspirators Ray and Lisa Loudermilk and Loretta Grape.

Following his indictment, trial, and conviction, Nelson was sentenced to forty-two months in prison, to be followed by three years of supervised release, during which he must perform 100 hours of community service and participate in a drug rehabilitation program. He was also assessed a $50 special fee. Ray and Lisa Loudermilk and Ms. Grape, who had pled guilty to the offense, received sentences of sixty, forty-eight, and thirty months, respectively. These sentences were downward departures from guidelines prescribed sentencing ranges of 188 to 235, 121 to 151, and 97 to 121 months, respectively, and were based upon the Loudermilks' and Grape's extensive cooperation with authorities and acceptance of responsibility for their crimes. *See United States Sentencing Commission's Sentencing Guidelines Manual*, §§ 5K1.1 at 5.41 and 3E1.1 at 3.23 (rev. ed. 1989) [hereinafter *Guidelines Manual* ].

The district court determined that the guidelines provided for a sentence for Nelson of incarceration for a period between 151 to 188 months, and a fine from $17,500 to $175,000. The guidelines range was determined by the quantity of methamphet-

amine involved in the operation, which was 18.75 pounds, by the finding that Nelson had obstructed justice in lying to DEA agents and lying at his trial, and by the determination that Nelson was a minor participant in the conspiracy. But, at Nelson's sentencing hearing, the court, citing section 5K2.0 of the *Guidelines Manual,* explained that "a departure is warranted to bring this defendant's sentence in line with the sentences that the Court has already imposed on other Defendants in connection with this same methamphetamine conspiracy." It then imposed a sentence of forty-two months confinement.

■ The government appeals the sentence.[1] It argues that the district court's reason for departing downward from the guidelines is prohibited as a matter of law and, even if it is not, the court clearly erred in finding Nelson entitled to lenity, given the facts of the case. The government also claims that the forty-two month sentence, almost one-fifth of the 151 to 188 month sentence the court deemed was proper for Nelson under the guidelines, and the lack of any fine, was unreasonable.

## II.

In reviewing appeals from sentences which are the result of departures from the guidelines, a number of panels of this court have relied on the three-pronged analysis originally set forth in *United States v. Diaz–Villafane,* 874 F.2d 43, 49 (1st Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989). The *Diaz–Villafane* approach has been used in upward departure situations, *see, e.g., United States v. Joan,* 883 F.2d 491, 494 (6th Cir. 1989); *United States v. Rodriguez,* 882 F.2d 1059, 1067 (6th Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1144, 107 L.Ed.2d

1048 (1990); and in downward departure cases. *See, e.g., United States v. Brewer,* 899 F.2d 503, 506 (6th Cir.1990); *United States v. Hays,* 899 F.2d 515, 519 (6th Cir. 1990).

■ The *Diaz–Villafane* approach calls for an appellate court to test a district court's sentence under three separate standards of review:

First, we assay the circumstances relied on by the district court in determining that the case is sufficiently "unusual" to warrant departure. That review is essentially plenary: whether or not circumstances are of a kind or degree that they may appropriately be relied upon to justify departure is, we think, a question of law.

Second, we determine whether the circumstances, if conceptually proper, actually exist in the particular case. That assessment involves fact finding and the trier's determinations may be set aside only for clear error.

. . . .

Third, once we have assured ourselves that the sentencing court considered circumstances appropriate to the departure equation and that those factors enjoyed adequate record support, the direction and degree of departure must, on appeal, be measured by a standard of reasonableness. 18 U.S.C. § 3742(e)(2).... In this context, reasonableness is determined with due regard for "the factors to be considered in imposing sentence," generally, and "the reasons for the imposition of the particular sentence, as stated by the district court...." 18 U.S.C. § 3742(d)(3).

*Diaz–Villafane,* 874 F.2d at 49.

The author's misgivings about the *Diaz–Villafane* review methodology notwith-

---

**1.** The government may appeal a sentence imposed pursuant to the guidelines under 18 U.S.C. § 3742(b). Section 3742(b) permits such appeals only "with the personal approval of the Attorney General or the Solicitor General." In *United States v. Hays,* 899 F.2d 515, 517 n. 1 (6th Cir.1990), we noted that the government should file proof of such approval with its notice of appeal. But we concluded in *Hays* that, although the government had not filed such proof with its notice of appeal, we had jurisdiction to

hear the appeal because, after oral argument, the government demonstrated that it had received the personal approval of the Solicitor General prior to appealing. In like manner, the government has supplemented the record in this case showing that it obtained the personal approval of the Acting Solicitor General to proceed with this appeal on February 6, 1989, two days prior to filing its February 8, 1989 notice of appeal. Therefore, we conclude that we have jurisdiction to hear this appeal.

standing,[2] it is now the settled standard of review for guidelines departure cases in this circuit.

### A.

■ Our first duty in applying the first prong of *Diaz–Villafane* is to identify the "circumstances" relied upon by the trial court in departing from the guidelines and then to decide, *de novo*, whether those circumstances are sufficiently "unusual" to justify the departure. *Diaz–Villafane*, 874 F.2d at 49; *Rodriguez*, 882 F.2d at 1067.

The district court described the circumstance justifying departure as follows:

> The Court, however, has decided in this case that some departure is warranted under Section 5K2 of the guidelines. The Court finds that a departure is warranted to bring this Defendant's sentence in line with the sentences that the Court has already imposed on other defendants in connection with this same methamphetamine conspiracy, and the Court will set that sentence at 42 months, which is a downward departure from the minimum 151 months called for by the guidelines.

The first question, then, is whether, as a matter of law, the district court's desire to bring the sentence of one of several co-conspirators into general conformity with the range of sentences imposed upon his confederates is a "circumstance" sufficiently "unusual" to justify departure.[3]

Of all the purposes that induced Congress to enact the Sentencing Reform Act, 18 U.S.C. § 3551 *et seq.*, which authorized the Sentencing Commission to issue guidelines, none was more compelling than Congress' desire to achieve greater uniformity in sentencing or, stated otherwise, to eliminate unreasonable disparity in sentencing.

18 U.S.C. § 3553(a)(6) states that one of the factors to be considered before imposing a sentence is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." The Sentencing Commission has declared that Congress' purpose was, in part, to achieve greater uniformity in sentencing "by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct by similar offenders" and to create greater proportionality "through a system that imposes appropriately different sentences for criminal conduct of different severity." *Guidelines Manual* Policy Statement at 1.2.

The Sentencing Commission attempted to achieve these goals by assembling a vast array of characteristics organized in a way that purportedly categorizes similar defendants similarly. For example, the elaborate drug quantity table appended to *Guidelines Manual* § 2D1.1 at 2.40–2.45 is one means of categorizing drug offenders who are convicted of manufacturing or dealing approximately the same amount of controlled substances. Offenders having comparable criminal histories fit within any one of six classes. *See Guidelines Manual* §§ 4A1.1 to 4B1.3 at 4.1–4.13. Offenders may also be grouped according to whether they did or did not obstruct justice, *see Guidelines Manual* § 3C1.1 at 3.9, whether they were major or minor participants in the underlying crime, *see Guidelines Manual* §§ 3B1.1 and 3B1.2 at 3.5–3.-6, and whether or not they accepted responsibility for their transgressions, *see Guidelines Manual* § 3E1.1 at 3.23; these latter considerations being an attempt to tailor personal characteristics to individual defendants.

---

**2.** Those misgivings are explained in the author's separate concurring opinion.

**3.** As part of its appeal, the government argues that the district court's explanation for its decision to depart from the guidelines failed to meet the clear statement requirement of 18 U.S.C. § 3553(c)(2). That provision requires courts departing from the guidelines to provide, in writing or orally, on the record, "the specific reason

for the imposition of a sentence different from that described [in the guidelines]." We reject the government's argument since the district court's explanation provides a sufficient basis for our review and gives the Sentencing Commission useful information it may use in formulating future versions of the guidelines. *See United States v. Kennedy*, 893 F.2d 825, 828 (6th Cir.1990).

The result of these and the many other classifications established in the guidelines is a sentencing scheme designed to eliminate unreasoned disparity among similarly situated offenders. However, the key word here is "unreasoned." Disparity in sentencing among criminal co-actors is not, *per se*, unlawful, or even necessarily undesirable. It is illogical, unjust, and unwarranted disparity that Congress' policy of sentence uniformity is intended to displace. We cannot say, as a matter of law (prong I of *Diaz–Villafane*), that there could never be a situation in which strict letter application of the guidelines would result in an unreasoned disparity of sentences among multiple defendants guilty of a single criminal transaction such that a district court would be justified in departing from the guidelines in order that reasonable sentence conformity might be achieved. It was this "difficulty of foreseeing and capturing a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision" that induced the Sentencing Commission to adopt its broad departure policy in formulating the guidelines. *Guidelines Manual* Policy Statement at 1.7.

Congress authorized the district courts to depart from the guidelines as follows:

The [sentencing] court shall impose a sentence of the kind, and within the range [of the guidelines] ... unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.

18 U.S.C. § 3553(b).

The Sentencing Commission then applied this policy in drafting its final version of the guidelines' departure provision:

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The controlling decision as to whether and to what extent departure is warranted can only be made by the court at the time of sentencing.

*Guidelines Manual* § 5K2.0 at 5.42–5.43.

The Sentencing Commission justified the need for broadly authorizing departures when it said:

[I]n principal, the Commission ... could prevent a court from using [specific listed factors] ... as grounds for departure. In this initial set of guidelines, however, the Commission does not so limit the courts' departure powers. The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When the court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.... [H]owever, the Commission does not intend to limit the kinds of factors ... that could constitute grounds for departure in an unusual case.

*Guidelines Manual* Policy Statement at 1.6.

Since there is a virtual rebuttable presumption of "appropriate" or "reasoned" uniformity in the guidelines, it should be the unusual case whose facts permit, even require, sentencing judges to depart from the guidelines in order to *achieve* reasoned uniformity of sentence among similarly situated criminal actors. But it is precisely the "unusual" case for which departure authority exists. The district courts enjoy a unique role in applying the guidelines.

They are responsible for fitting flesh and blood defendants within a theoretical framework that attempts to quantify attitude, behavior, culpability, and a myriad of subjective characteristics objectively. Because that task is so specialized, we think reviewing courts are obliged to give considerable deference to district courts' decisions to depart from the sentence guidelines, including the unusual purpose of achieving *reasoned* sentence uniformity. *See* 18 U.S.C. § 3742(e).[4]

For these reasons, we conclude that the district courts generally and, perforce, the district court in this case, are not precluded *as a matter of law* from departing from the guidelines in order to generally conform one conspirator's sentence to the sentences imposed on his co-conspirators.

### B.

■ The second *Diaz–Villafane* prong requires us to determine whether the district court clearly erred in finding that the unusual "circumstance" relied upon for the departure decision in this case "actually existed." Clearly, it did not. The circumstance that dictated the departure decision was the great disparity between the sentences given defendant's co-conspirators and the guidelines range appropriate for defendant's sentence. There is no question that a very considerable disparity exists between the twelve and one-half years to fifteen and one-half years sentence that would have been imposed upon the defendant under the guidelines, and the sixty, forty-eight, and thirty months sentences that were imposed upon his co-conspirators.

The question that does remain is whether the "degree," as *Diaz–Villafane* puts it, of the district court's departure was, in the circumstances, "reasonable." Resolution of that question takes us to the third prong of the *Diaz–Villafane* formula.

### C.

We must, under prong III, determine whether the district court's decision to sentence Nelson to nearly one-fifth the period of confinement he would otherwise have received under the guidelines, for the purpose of conforming his sentence, generally, with the sentences of his co-conspirators, was reasonable. This third of the *Diaz–Villafane* three standards of review in one is a criterion for appellate scrutiny. Apparently it does not call for testing the "degree" of the district court's departure for abuse of discretion; rather, the test appears simply to be whether the amount of the departure is "agreeable to or in accord with reason or sound judgment; logical."[5] It is, as *Diaz–Villafane* puts it, a "judgment call." ·

The reasonableness prong of the *Diaz–Villafane* test derives from current 18 U.S.C. § 3742(e)(3). That provision directs the courts of appeals to consider many factors relevant to the imposition of a sentence in reviewing the reasonableness of a district court's sentencing decision.[6] In this appeal, those factors include the nature of the offense the defendant committed, characteristics regarding the defendant, the deterrent effect of the sentence, and the policies behind the guidelines.[7]

---

**4.** 18 U.S.C. § 3742(e) states:

The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and shall give due deference to the district court's application of the guidelines to the facts.

**5.** The Random House College Dictionary 1100 (rev. ed. 1975).

**6.** 18 U.S.C. § 3742(e)(3) provides that a court of appeals reviewing a district court's sentencing decision shall evaluate the reasonableness of the sentence imposed considering "the factors to be

considered in imposing a sentence, as set forth in chapter 227 of this title," that is 18 U.S.C. §§ 3551–3586, and "the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c)."

**7.** 18 U.S.C. § 3553(a) provides a fairly comprehensive list of "factors to be considered in imposing a sentence" from which we have derived the considerations directing our discussion. Section 3553(a)'s list includes:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

Since the district court's rationale for departing from the guidelines was based on the disparity between the sentence Nelson would have received under the guidelines and the sentences his co-conspirators actually received, it is necessary for us to analyze the sentencing factors relevant to Nelson in a comparative manner. The propriety of the sentences received by Nelson's co-conspirators is not now before us; indeed, the government concedes that the departure sentencing of Nelson's co-defendants was lawful.

Considering the first sentencing factor, the nature of the offense for which Nelson was convicted, we note that Nelson's crime was the same as that for which all the defendants were convicted: conspiracy to manufacture substantial quantities of methamphetamine, violating 21 U.S.C. § 846. At the outset, then, fairness would seem to dictate that Nelson receive a sentence generally comparable to the sentences of his co-conspirators, with some variance expected for dissimilar criminal histories and other relevant distinguishing criteria. But the second sentencing factor, defendant's characteristics, suggests a basis for some disparity between the sentence appropriate for Nelson and for his co-conspirators.

As previously noted, the confinement portion of the sentence Nelson would have received had he been sentenced according to the guidelines was some seven and one-half to ten and one-half years longer than the sentence actually imposed on Nelson's highest-sentenced co-conspirators. Under the guidelines, he could have been sentenced from twelve and one-half to fifteen and one-half years, while his co-conspirators were sentenced to five, four, and two and one-half years. The guidelines also called for a fine of $17,500 to $175,000 for Nelson; his co-defendants received no fines.

The sentences imposed on Nelson's co-conspirators were very substantial reductions from the sentences recommended under the guidelines. Ray Loudermilk received five years, although the guidelines called for a sentence of incarceration between fifteen and twenty years. Lisa Loudermilk got four years, although the guidelines called for some ten to twelve years in prison. Ms. Grape was sentenced to two and one-half years, though she could have gotten approximately eight to ten years under the guidelines.

The dramatic departures from which these defendants benefited, the propriety of which is not now before us, was based primarily on their extensive cooperation with authorities. According to the government, the cooperation of these defendants led to the prosecution of some twelve individuals, seven of whom were "major dealers." The government moved for downward departure on this basis, and the district court granted the motion as to each defendant.[8]

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines that are issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(1) and that are in effect on the date defendant is sentenced;

(5) any pertinent policy statement issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)(2) that is in·effect on the date the defendant is sentenced;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

8. The guidelines permit the district courts, upon motion by the government, to reduce the sentence a defendant would otherwise receive if "the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense." *Guidelines Manual* § 5K1.1 at 5.41.

■ While we believe it was not improper *as a matter of law* for the district court to depart downward in an attempt to generally conform Nelson's sentence with the sentences of his co-conspirators, we believe the substantial factual differences between Nelson's case and his confederates' suggest that the degree of the district court's departure was not reasonable. The principal reason for the radical reduction in the co-conspirators' sentence did not apply to Nelson; moreover, independent reasons existed to deny Nelson the "break" given his confederates.

Unlike his co-conspirators, Nelson was not cooperative with authorities. Indeed, prior to reducing Nelson's sentence, the district court found that Nelson obstructed justice by lying to DEA agents during their investigation and by lying at his trial.

Presumably, authorizing a district court to depart from the guidelines for defendants who cooperate with authorities was Congress' way of giving defendants an incentive to cooperate. Rewarding one who has not cooperated with authorities to essentially the same degree as those who have cooperated strains the incentives inherent in reward and punishment. While the district court did not claim to base the departure decision on Nelson's cooperation, the decision was related to the co-conspirators' cooperation in that their reduced sentences created the norm by which the fairness of Nelson's sentence was measured. Aside from considerations of objective fairness, such an outcome could have the effect, in future cases, of diminishing the incentive to cooperate by inducing later-charged conspirators to avoid any risks associated with cooperating without losing the hope that they may still receive a lower sentence.

Moreover, while sentence uniformity is generally the policy behind the guidelines, we believe reasoned uniformity is the goal. The degree of the district court's departure in this case can only be regarded as uniformity for uniformity's sake. Permitting untoward departures in situations such as this could justifiably increase unpredictability in sentencing; a result directly contrary to a principal purpose of the guidelines.

On the basis of these considerations, we believe the district court's radical departure from the sentence recommended by the guidelines, sentencing Nelson to three and one-half years when he could have received as much as fifteen and one-half years, was unreasonable.

We realize that "[r]easonableness is a flexible standard." *Joan*, 883 F.2d at 496. A district court's sentencing decision "must be given great deference, and, unless there is little or no basis for the trial court's action in departing, it must be upheld. . . ." *Id.* But reasonableness is not a standard without substance. "The [sentencing] court must act in a rational and just way in an effort to vindicate one of the major purposes of criminal law—deterrence, punishment, isolation, rehabilitation, or retribution." *Id.* We do not view the district court's decision in this case as likely to further those purposes. While we believe sentence conformity is, in an appropriate case, a legally available rationale for departing from the guidelines, we do not think the degree of departure in the sentence given Nelson was reasonable.

The question that remains, of course, is what may be done upon remand. Error free sentencing and the appellate review of sentences were simpler when, in nearly all cases, appellate scrutiny was limited to the question whether the sentence imposed was within the limits described in the statute defining the relevant punishment. Now things are different. *Diaz–Villafane* gives this court the difficult role of reviewing a sentencing court's notion of what is "reasonable" in departure sentencing under the guidelines. We do not welcome that role, but neither can we escape it.

Eschewing the role of second guesser, and mindful of the broad latitude and considerable deference that ought to be accorded a sentencing court imposing a departure sentence, we are satisfied simply to direct the wise and experienced district judge to whom this case is being remanded to resentence the defendant after giving careful consideration to the *reasons* we

have set forth for disapproving the extreme departure from the guidelines in the sentence originally imposed.

### III.

For the foregoing reasons, the sentencing decision of the district court is VACATED, and the case is REMANDED for resentencing.[9]

RYAN, Circuit Judge, concurring separately.

Although I agree that we are probably obligated to apply the *Diaz–Villafane*[1] standard of review in this case, I write separately to express my dissatisfaction with it. The *Diaz–Villafane* approach is, I think, an uncommonly ill-conceived formula for reviewing sentence guidelines departures. It artificially fragments into three distinct components, each having a *different* standard of review, what is essentially a unitary trial court decision. In the first prong of its three standards of review in one, the *Diaz–Villafane* formula purports to make a question of law requiring *de novo* review of such vague notions as how "unusual" the case is, and whether the "circumstances" relied upon by the sentencing court for the departure decision "may be appropriately relied upon." In the second of the three standards of review, it purports to make a question of fact, requiring a clearly erroneous standard of review, whether such unusual circumstances "actually exist." The third standard of review, whether the sentence is "reasonable," is reached only if the appellate court's *de novo* conclusion is that the "case is sufficiently unusual to warrant departure" and the district court was not clearly erroneous in finding that the "circumstances" it relied on "actually exist[ed]."

The result, of course, is a review methodology that all but ignores the reality that the essence of a trial court's departure decision, in most cases, is a product of the countless unquantifiable components of sentencing justice, including the interests of the victim, the defendant, his or her family and associates, and the "communities" involved, both immediate and remote. The *Diaz–Villafane* formula all but reads out of the sentence review process appropriate deference to the trial court's logic, experience, wisdom, and unique insight into the case as they are to be applied in the complex art of criminal sentencing. The sum of the three *Diaz–Villafane* standards of review is an unsuccessful attempt to make objective what is largely, if not essentially, subjective; it attempts to make science of what is art.

Interestingly, no panel of this court has carefully analyzed the *Diaz–Villafane* review formula. The first case in which it was embraced simply employed it without analysis or even an express statement of adoption. *See Rodriguez,* 882 F.2d at 1067. Other panels followed suit, all without any analysis to the soundness of the *Diaz–Villafane* methodology. Thus, a new theory of legal analysis has become, in this circuit, an apparently settled method of proceeding.

Despite that the *Diaz–Villafane* approach is singularly unsuited to a sound analysis of the lawfulness of the trial court's departure decision in this particular case, I concur in its application in this case in deference to our "law of the circuit" tradition and in the name of the maxim that it is sometimes better that the law be clear than that it be wise, if it cannot be both.

---

9. The government suggests that the district court's decision not to fine Nelson when it had the authority to do so was improper. But, the district court declined to fine Nelson "because the Court makes a determination that the Defendant is not able to pay that fine." If a defendant establishes that he cannot pay a fine, a district court may waive the fine and impose an additional sanction, such as community service, in-

stead. *See Guidelines Manual* § 5E1.2(f) at 5.19. Nelson was required to provide 100 hours of community service. Therefore, on remand, the district court need not revisit this issue.

1. *United States v. Diaz–Villafane,* 874 F.2d 43 (1st Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989).