UNITED STATES of America, Plaintiff–
Appellee, Cross–Appellant,

v.

Gary F. EPLEY, Ronald J. Pike, and
James Goodman, Defendants–
Appellants, Cross–Appellees.

Nos. 94–5100 to 94–5102, 94–
5179 and 94–5181.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 2, 1995.

Decided April 24, 1995.

Rehearing and Suggestion for Rehearing
En Banc Denied in No. 94–5102
June 9, 1995.

Stephen G. Frye, Asst. U.S. Atty., Office of U.S. Atty., Louisville, KY, Miriam R. Eisenstein (argued and briefed), Dennis J. Dimsey, U.S. Dept. of Justice, Civ. Rights Div., Appellate Section, Washington, DC, for U.S.

C. Fred Partin (argued), Barbara M. Gunther (briefed), C. Fred Partin & Associates, Louisville, KY, for Gary F. Epley.

David A. Lambertus (argued and briefed), Elizabeth O. Kinnaird, Louisville, KY, for Ronald J. Pike.

Samuel Manly, Louisville, KY (argued and briefed), for James Goodman.

Before: GUY, BOGGS, and SILER, Circuit Judges.

BOGGS, Circuit Judge.

Gary Epley, Ronald Pike, and James Goodman were each convicted for their involvement in a conspiracy to violate the civil rights of Ricky Pardue by setting up a false arrest in which they planted drugs and an illegal firearm in his possession. Epley appeals his sentence, Pike appeals his conviction for conspiracy to violate civil rights, in violation of 18 U.S.C. § 241, and his sentence, and Goodman appeals his conviction for conspiracy to violate civil rights, in violation of 18 U.S.C. § 241, and for deprivation of rights under color of law, in violation of 18 U.S.C. § 242. The government cross appeals the calculation of Pike's and Goodman's sentences. We affirm the convictions, but vacate the sentences of Pike and Goodman, and remand for resentencing.

## I

The facts of this case are complicated, and involve numerous people. David Tingley and George Tingley owned Resthaven Memorial Park, a cemetery, and were part owners of Special Services, a detective agency located in a house on the premises of Resthaven. Pike was a former Jefferson County policeman, and worked at Resthaven and Special Services. Joanie Pardue was a secretary, first for Special Services, then for Resthaven. She was also the wife of Ricky Pardue, the victim of this crime, and began an affair with David Tingley in the fall of 1990. Epley was a captain in the St. Regis Police Department and operated the Kentuckiana Detective Agency. James Goodman was a police sergeant in the St. Regis Police Department.

The staff of Special Services used Special Services as a repository for weapons. Weapons were stored in the house at the cemetery and in a crypt. They feared that Joanie's husband, Ricky, who knew about their activities and had learned about the affair between his wife and David Tingley, would report their activities to authorities. Their fears were justified—in fact, Pardue offered his services as an informant to the FBI in October 1990. These fears were confirmed when Pardue, arrested after a fight, told the local police that he was working for the FBI. Word of his claim got back to Special Services.

In an effort to discredit Ricky Pardue, Epley and Pike met with David Tingley at Remington's, a restaurant. David Tingley agreed to supply Epley with drugs and an illegal firearm equipped with a silencer. Epley would then find some reason to arrest Ricky Pardue and plant these items in Pardue's possession. David Tingley agreed to pay for the arrest.[1] Another Special Services employee, John Bersot, was dispatched to the crypt to obtain drugs and guns for the task.

David Tingley received the drugs and guns from Bersot and delivered them to Pike, who delivered them to Epley. Epley then met with Goodman and told Goodman that Ricky has been "causing problems." Epley proposed that Goodman and he should stake out Pardue's home in Louisville. He told Goodman he would pay him $500 for the trouble.[2] Goodman borrowed an unmarked white Ford Crown Victoria from another St. Regis officer to use for the stakeout.

The stakeout, on November 1, 1990, in front of Pardue's house, did not go unnoticed. Pardue saw Goodman and Epley, but could not initially identify them. A neighbor, another police officer, also noticed the car. This neighbor testified that he drove by in a marked police car and saw the two men in the car duck as he passed.

Nevertheless, Ricky Pardue left his house, and Goodman and Epley followed him. According to Epley, Goodman exclaimed that Pardue ran a stop sign.[3] Goodman and Epley used their car's lights to signal for Pardue to pull over, but instead he fled and drove back to his house, less than a mile away. Epley and Goodman pulled behind Pardue's car, and left their car with guns drawn. Epley apprehended and handcuffed Pardue in front of his house, and handed him over to Goodman. Goodman took Pardue to the Crown Victoria. Epley searched Pardue's car and "found" the gun and drugs he planted (as well as two other pistols actually belonging to Pardue). Pardue testified that he observed Epley removing the cocaine from his right front pocket, although it is unclear from Pardue's testimony whether Goodman could also see Epley plant the drugs. Epley and Goodman called the Louisville Police Department, and Pardue was taken into custody. Pike drove by during the incident, observed the arrest, and reported back to David Tingley that the plan had been executed.

Over the next several months, Epley and Goodman continued to affirm the validity of the arrest. Epley testified before the grand jury that Pardue ran the stop sign, refused

---

1. Epley testified that David Tingley ultimately agreed to pay $8,000.

2. Epley testified that Goodman received about $1,000.

3. Pardue testified that he did not run the stop sign.

to pull over, attempted to run the St. Regis officers off the road, and reached down in his car as though to grab a weapon. Epley also affirmed that, on searching Pardue's car, he found the cocaine and silenced gun. At the probable cause and suppression hearing in April 1991, which both Epley and Goodman attended, the commonwealth's attorney asked Epley whether the arrest was a set-up and Epley denied it was. Epley testified that Pardue ran the stop sign and that the arrest was legitimate.

The BATF and IRS opened an investigation. Meanwhile, David and George Tingley sold Resthaven and Special Services. The state criminal case against Pardue was dismissed in the fall of 1991. In early 1992, John Bersot began demanding money from David Tingley to keep silent. David Tingley agreed to cooperate with the investigation at that point. Bersot also agreed to testify in exchange for immunity. Epley pled guilty and agreed to cooperate.

At trial, Pike and Goodman were convicted, Pike of conspiracy under § 241[4] and Goodman of both conspiracy under § 241 and deprivation of rights under color of law under § 242.[5] Epley was sentenced to 84 months under his plea agreement (in which he pled guilty to one count each of conspiracy to violate civil rights and use of a firearm during a crime of violence, 18 U.S.C. § 924(c), and three counts of willful failure to file income tax returns), and Pike was sentenced to 37 months for his conviction in this case and on the accompanying weapons charge (on appeal as No. 93–5104). Goodman and David Tingley received 3 years of unsupervised probation, six months to be served in a half-way house.

## II

We first address the issues raised by appellants Pike and Goodman concerning their convictions. We find that none of these alleged errors require reversal.

## A

Goodman raises five issues on appeal. He argues first that the government presented insufficient evidence to convict him of the conspiracy count and the deprivation of civil rights count. Second, he claims that testimony discussing his "silence" and failure to cooperate violated his Fifth Amendment rights. Third, he asserts that he was prejudiced when the court initially denied his severance motion. Fourth, he argues that the court should have declared a mistrial after Epley boasted of passing a polygraph examination. Pike also argues that the admission of the polygraph testimony, although accompanied by an admonition, was prejudicial. Fifth, Goodman claims that the court erred by providing the jury with a jury nullification instruction.

First, we consider whether the government produced sufficient evidence to convict Goodman of the § 241 and § 242 charges. We review the sufficiency of the evidence to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ellzey,* 874 F.2d 324, 328 (6th Cir.1989) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

To obtain a conviction for conspiracy to violate civil rights under § 241, the government must prove that Goodman know-

4. 18 U.S.C. § 241 reads:
   **Conspiracy against rights**
   If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same ... They shall be fined [or imprisoned, or both] under this title....

5. 18 U.S.C. § 242 reads:

**Deprivation of rights under color of law**
Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State ... to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined ... or imprisoned ... or both.

ingly agreed with another person to injure Pardue in the exercise of a right guaranteed under the Constitution. *Anderson v. United States,* 417 U.S. 211, 223, 94 S.Ct. 2253, 2261, 41 L.Ed.2d 20 (1974). Specific intent to deprive another of civil rights is an element of the offense that the government must prove beyond a reasonable doubt. *See, e.g., United States v. Hamilton,* 684 F.2d 380, 384 (6th Cir.), *cert. denied,* 459 U.S. 976, 103 S.Ct. 312, 74 L.Ed.2d 291 (1982). Proof of the crime of deprivation of civil rights under § 242 also requires the government to show that Goodman had the specific intent to deprive Pardue of a right under the Constitution. *Screws v. United States,* 325 U.S. 91, 104, 65 S.Ct. 1031, 1036, 89 L.Ed. 1495 (1945); *United States v. Senak,* 477 F.2d 304, 306 (7th Cir.), *cert. denied,* 414 U.S. 856, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973). "[O]nce a due process right has been defined and made specific by court decisions, that right is encompassed by § 242." *United States v. Stokes,* 506 F.2d 771, 774–75 (5th Cir.1975) (citing *Screws* ). Courts have applied § 242 to punish police officers who have abused their authority under "color of law." *See United States v. Koon,* 34 F.3d 1416 (9th Cir.1994); *United States v. McDermott,* 918 F.2d 319, 325 (2d Cir.1990), *cert. denied,* 500 U.S. 904, 111 S.Ct. 1681, 114 L.Ed.2d 76 (1991); *United States v. Alonso,* 740 F.2d 862, 872–73 (11th Cir.1984), *cert. denied,* 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985).

The constitutional rights at issue here are Pardue's right to be free from "seizure" without probable cause, in violation of the Fourth Amendment, and his rights under the due process clause of the Fourteenth Amendment to be free from arrest without probable cause and to be free from having false evidence presented against him. *See Briscoe v. La-Hue,* 460 U.S. 325, 339, 103 S.Ct. 1108, 1117, 75 L.Ed.2d 96 (1983) (discussing intent behind Klan Act, noting victims of Klan perjury denied "equal protection"); *Michigan v. Summers,* 452 U.S. 692, 696 n. 5, 101 S.Ct. 2587, 2591, 69 L.Ed.2d 340 (1981); *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968) (arrest requires probable cause); *United States v. Price,* 383 U.S. 787 at 806, 86 S.Ct. 1152 at 1163, 16 L.Ed.2d 267 (1966); *United States v. Langer,* 958 F.2d 522 (2d Cir.1992) (unsupported vehicle stops by police violated Fourth Amendment); *McDermott,* 918 F.2d at 325 (false arrest is violation of due process) (citing *United States v. Garza,* 754 F.2d 1202 (5th Cir.1985)); *Winslow v. Romer,* 759 F.Supp. 670, 675 (D. Colo.1991) (violation of civil rights when "officials 'conspire to procure groundless state indictments and charges based upon fabricated evidence' ") (quoting *Anthony v. Baker,* 767 F.2d 657, 662 (10th Cir.1985)).

We hold that the government produced sufficient evidence for a rational jury to convict Goodman of violating § 241 and § 242. A rational jury could credit Pardue's account of the events preceding the arrest, such as his testimony that he did not, in fact, run a stop sign. Furthermore, Goodman was with Pardue when Epley planted the drugs, and Pardue testified that he could see Epley remove the contraband from his pocket, after which Goodman asked "Coke?" to which Epley replied "Cocaine." A jury could infer that, like Pardue, Goodman was able to see Epley plant the drugs. No one contests the assertion that Goodman knew he was being paid by David Tingley to watch and arrest Pardue because Pardue was "bothering" Tingley. In addition, Goodman also appeared in state court proceedings against Pardue to confirm Epley's false account of the arrest.

Goodman argues in his brief before this court that in order to convict him under § 241 and § 242, the jury must have believed that he knew specifically that Epley was going to plant drugs and an illegal weapon on Pardue. While a conviction under either § 241 or § 242 requires specific intent to violate the victim's constitutional rights, it does not, in this context, require that Goodman knew beforehand of the plan to plant drugs and a gun on Pardue. A rational jury could weigh the evidence, judge the credibility of the various witnesses, and determine that Goodman had the specific intent to violate Pardue's Fourth and Fifth Amendment rights by executing a false arrest.

■ In his second issue on appeal, Goodman states that evidence was elicited that the

defendants had "agreed" to keep quiet and "take the fifth" in the face of an official investigation into Pardue's arrest. Goodman argues that this evidence violated his Fifth Amendment right not to testify, and that the resulting prejudice justifies granting him a new trial.

During Epley's direct testimony, Epley mentioned that "it was an understanding nobody was going to say anything." Epley testified that he discussed with Goodman and Pike the story they would tell to cover up the details of the arrest. Several sentences later, Epley testified that "in fact, if anybody was called in front of the grand jury they would have took the Fifth." During cross-examination, Goodman's counsel asked Epley what Goodman's reaction had been when the government began investigating the arrest, and Epley responded that Goodman "wanted to take the fifth." Later, during Bersot's testimony that he and David Tingley planned to "take the fifth," Goodman's counsel moved for a mistrial, but instead the court admonished the jury.[6]

The prosecution elicited testimony that called attention to Goodman's intention to exercise his right not to testify against himself. However, no defense counsel raised an objection during Epley's testimony on this issue, which contains the information that could conceivably harm Goodman. Only when Bersot testified did Goodman raise this issue, and the court provided an admonition to the jury.

■ This court will not reverse a conviction where the prosecution has elicited testimony that calls attention to a defendant's or witness's invocation of his Fifth Amendment rights, when the comments at issue occurred only briefly during a long trial, and the court sufficiently instructed the jury to disregard them. *United States v. Clark*, 988 F.2d 1459,

1464 (6th Cir.) (citing *Namet v. United States*, 373 U.S. 179, 187, 83 S.Ct. 1151, 1155, 10 L.Ed.2d 278 (1963)), *cert. denied*, —— U.S. ——, 114 S.Ct. 105, 126 L.Ed.2d 71 (1993). A reviewing court should defer to the trial court's decision and should reverse only for abuse of discretion. *Clark*, 988 F.2d at 1464. Given the minor place this evidence occupied in a lengthy and complicated trial, it is unlikely the jury was so swayed by it that it affected the result of the trial. *See Spalla v. Foltz*, 788 F.2d 400, 403–04 (6th Cir.) (indirect comment on defendant's failure to testify not automatically reversible), *cert. denied*, 479 U.S. 935, 107 S.Ct. 410, 93 L.Ed.2d 362 (1986).

■ Third, Goodman argues that he should have received a mistrial because the court only granted severance of his case midtrial. We review *de novo* the failure to grant a severance under Fed.R.Crim.P. 8. *United States v. Hatcher*, 680 F.2d 438, 440–41 (6th Cir.1982).

Goodman argues that his pre-trial motions to sever counts unrelated to him (Counts 5, 8, and 9) under Fed.R.Crim.P. 8(a) and (b) should have been granted.[7] Count 8 charges George Tingley with possession of a machine gun, in violation of 18 U.S.C. § 922(*o*), and Count 9 charges George Tingley with possession of an unregistered silencer, in violation of 26 U.S.C. § 5841 and 5861(d).

Goodman acknowledges that the court granted his motion to sever on the fifth day of trial. Goodman nevertheless claims that he was prejudiced because the jury heard evidence unrelated to him, and that his conviction should be reversed, citing *United States v. Bibby*, 752 F.2d 1116, 1122 (6th Cir.1985), *cert. denied*, 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986), and *Hatcher*, 680 F.2d at 442.

---

**6.** The admonishment was as follows:
Members of the jury, you've heard several references to [an] agreement to exercise a constitutional right. The exercise of a constitutional right in no way constitutes an illegal conspiracy or any part thereof.... [T]he Constitution is there to be exercised by every citizen and, in fact part of this case involves the failure or an invasion of the constitutional right. So we have the constitutional right and if somebody wants to

plead the 5th Amendment they're certainly entitled to, they're not to be condemned for it or held liable for it in any way. Let's keep that in mind.... In that regard, this testimony regarding somebody deciding to exercise the constitutional right ... it's to be disregarded in its entirety.

**7.** Counts 6, 7, and 10 were dismissed before trial.

We find that Goodman conceded at trial that Count 5 was properly joined with Counts 1–4 for trial. We also note that the court admonished the jury that Goodman was not named in Count 5 when evidence regarding Count 5 (the guns with silencers provided to Epley by Pike but not planted in Pardue's car) was presented.

We conclude that Counts 8 and 9 were properly joined with Counts 1 through 4 under Rule 8(b). The secret cache of guns was part of the same series of transactions that made up the conspiracy. The Special Services staff wanted to discredit Pardue because they believed he would tell the FBI about their illegal activities (including their arsenal). Nevertheless, exercising an abundance of caution, the trial court severed Counts 8 and 9 on the fifth day of trial.

Even if Counts 8 and 9 were improperly joined, any error that persisted through the first four days of trial was harmless to Goodman. The Supreme Court adopted a nonconstitutional harmless error test for misjoinder under Rule 8 in *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986). The Court held that an error involving misjoinder "requires reversal only if the misjoinder results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Ibid.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)). The testimony that was admitted before severance relevant to the particular weapon charged in Counts 8 and 9 simply referred to "guns" at Special Services. The additional weapon had not been introduced into evidence. Furthermore, ample evidence in the record supports Goodman's convictions on Counts 1 and 2 for the civil rights violations. Therefore, even if Counts 8 and 9 had been improperly joined, we would not reverse Goodman's conviction because any error was harmless. *Hatcher*, 680 F.2d at 442.

■ In the fourth contention raised on appeal, Goodman and Pike both argue that the court should have declared a mistrial after Epley boasted of passing a polygraph examination. During questioning by Goodman's attorney, Epley mentioned that he had passed a polygraph test.[8] On objection by Goodman's and Pike's attorneys, the court admonished the jury to disregard the remark. Both Pike and Goodman claim on appeal that the admonishment was insufficient, and their convictions should be reversed.

This passing reference to a polygraph test taken on a different matter is not reversible error. *United States v. Walton*, 908 F.2d 1289, 1291–93 (6th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). Epley's polygraph comment was in reference to another investigation, and the court promptly admonished the jury to disregard it. We do not find that the evidence of Pike's and Goodman's guilt is otherwise so close that this remark would have prejudiced the jury. *See United States v. Murray*, 784 F.2d 188, 189 (6th Cir.1986).

■ Finally, Goodman argues that the court erred by providing the jury with a jury nullification instruction. We find no merit to this issue. *See United States v. Krzyske*, 836 F.2d 1013, 1021 (6th Cir.), *cert. denied*, 488 U.S. 832, 109 S.Ct. 89, 102 L.Ed.2d 65 (1988).

### B

Pike raises two trial errors on appeal. He claims first that the court erred by rereading the testimony of Robert Epley (Gary's father), thus placing undue emphasis on it. Second, he argues that the court erred by

---

8. The exchange was as follows:

Q. But you also talked with him [D. Tingley] about other things unrelated to any of the matters that we're here about today, such as for instance the so-called, quote, murder of a state trooper in Laurel County, correct?

A. That's correct. I took a polygraph on that, passed that, yes sir, that's correct. There's a lot of different things.

MR. MANLY: May we approach?

THE COURT: I don't think it's necessary.... I'll ask the jury to disregard that last statement and I think everybody knows why.

After a brief recess:

THE COURT: Members of the jury, the witness made reference to a polygraph test. That evidence is improper, the statement with regard to polygraph tests must be disregarded by you and not considered in any way during your deliberation.

admitting a prejudicial photo of Pike and Tingley taken at Remington's on a previous occasion.

■■■■ We review the trial court's decision to read a witness's testimony to the jury for abuse of discretion. *United States v. Padin*, 787 F.2d 1071, 1076 (6th Cir.), *cert. denied*, 479 U.S. 823, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986). During deliberations, the jury asked the court for copies of the testimony of four witnesses. After discussing the request with counsel, the court asked the jury to consider again what testimony they truly desired, because to provide all this testimony would require time to redact the transcripts of bench conferences and other information the jury should not read. The jury adjourned for the day, and the next day responded that they wanted to hear the testimony of Robert Epley. Pike's counsel objected, noting that whatever admonition the court gave the jury, by reading this testimony and no other, the testimony would be overemphasized. The court called the jury in, and gave them an admonition to consider the testimony as a whole, and not to focus on particular answers given by the particular witness. After reading the testimony, the court again admonished the jury not to emphasize this piece of evidence over others.

In his testimony, Robert Epley stated that he ran Kentuckiana Detective Agency, and that he knew Pike and Goodman. He testified that Goodman looked up to Gary Epley. He recalled that in October 1990, Bersot and Pike borrowed radios from the office. He also stated that through October 1990, George Tingley, David Tingley, Ron Pike and Gary Epley would meet frequently for lunch. Robert Epley also testified that George Tingley and Pike came by his office in 1991, with George bearing bruises and scars from a beating. George said David had beaten him up while Bersot and another man held him down.

We have recognized two dangers from reading testimony to a jury. The first is that the jury may accord undue emphasis to the testimony. *Padin*, 787 F.2d at 1076 (citing *United States v. Varsalona*, 710 F.2d 418, 421 (8th Cir.1983)); *United States v. Nolan*, 700 F.2d 479, 486 (9th Cir.), *cert. denied*, 462

U.S. 1123, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983). The second is that the testimony reviewed by the jury may be taken out of context. *Padin*, 787 F.2d at 1076 (citing *Government of Canal Zone v. Scott*, 502 F.2d 566, 570 (5th Cir.1974)). In *Padin*, we also noted that "these concerns are escalated after the jury ha[s] reported its inability to arrive at a verdict." 787 F.2d at 1076–77 (citing *Henry v. United States*, 204 F.2d 817 (6th Cir.1953)). It does not appear that the jury made such a report in our case.

Here, the jury heard the entire testimony of Robert Epley, so the jury would not have taken part of the testimony out of context. Robert Epley's testimony did not contradict the testimony of other witnesses, but it did add evidence of a beating of George Tingley by David Tingley. This testimony would seem to harm only David Tingley, who is not a defendant. We do not find that Pike suffered any prejudice by the reading of the testimony, because as to him the testimony only confirmed evidence presented by other witnesses.

Pike's argument on appeal regarding the photograph is similarly unconvincing. During his testimony, David Tingley was asked to identify a photograph. He said that it depicted himself, Pike, and the manager of Remington's. Pike argues that this photo should not have been introduced as evidence, because it would mislead the jury into believing that the alleged conspiracy at Remington's was documented.

■■■ Whether to admit a photograph is a determination the trial court has discretion to make, especially where, as here, the party appealing the decision did not object below. We find no error in allowing the photograph in evidence.

### III

We next address Epley's and Pike's sentencing issues. Epley claims that the government should have requested, and the court erred by not granting, a downward departure to credit Epley for his cooperation, as promised in his plea agreement. Pike argues that the court erred by sentencing him to a longer sentence than Goodman,

because Pike was only found guilty of Count 1 while Goodman was found guilty of Counts 1 and 2.

■ Epley's argument is without merit. Epley's plea agreement included the statement:

> [I]f the United States deems that such a departure is warranted, the United States will move for a downward departure pursuant to 18 U.S.C. § 3553(e) and § 5K1.1 of the Sentencing Guidelines, stating that defendant has provided substantial assistance in the investigation or prosecution of other persons who have committed offenses. The United States retains complete discretion both in determining whether a § 5K1.1 departure motion is warranted and in determining the extent of any departure requested.

Epley joined a plea agreement in which the government reserved complete discretion over whether to request a downward departure. It would go against the terms of the plea agreement to find that the government was obliged to ask for such a departure. It was not erroneous for the court to deny Epley's motion to withdraw his plea, since the government has not violated its agreement with him. *See United States v. Mandell*, 905 F.2d 970 (6th Cir. 1990). It follows that the court was under no obligation to resentence Epley.

■ Pike was sentenced to 37 months after the jury found him guilty of Count 1. Pike argues on appeal that he should have received a lighter sentence than Goodman, who was found guilty of both Counts 1 and 2.

■ This court cannot reverse a sentence imposed under the Guidelines unless based upon a legal or factual error. *United States v. Lavoie*, 19 F.3d 1102, 1102–03 (6th Cir.1994). This court lacks jurisdiction over a claim that the sentencing court refused to depart downward. *Id.* at 1103. However, this court may review a sentence based on a legal error, even if within the Guidelines range. *Id.* at 1104. Pike does not present this court with any legal error to review, so we find this argument without merit.

## IV

We now address the government's sentencing cross-appeal. The government argues that the district court incorrectly calculated the base offense level for conspiracy to interfere with civil rights. It appeals the sentences of Pike and Goodman on this basis. It also argues that the court was not authorized to depart downward and sentence Goodman only to probation, and that Goodman's sentence should also be vacated and remanded for resentencing on this basis.

■ We review *de novo* the district court's interpretation of the Sentencing Guidelines. *United States v. Gresser*, 935 F.2d 96 (6th Cir.), *cert. denied*, 502 U.S. 885, 112 S.Ct. 239, 116 L.Ed.2d 195 (1991).

## A

First, the government appeals the court's calculation of Pike's and Goodman's sentences. Guideline § 2H1.1 contains the method for calculating the offense level for a conspiracy to interfere with civil rights.[9] Under § 2H1.1, the court should use as the base level the greater of 15 or 2 plus the offense level for the underlying offense. The government argued at sentencing that the underlying offense in this conspiracy was "unlawful restraint." Although there is no federal crime called "unlawful restraint," the government noted that the Guidelines provide a base level of 24 in § 2A4.1, titled "Kidnapping, Abduction, Unlawful Restraint," so the base level for each defendant should have been 26. *See* USSG § 2A4.1. As an alternative, the government argued that

---

9. Section 2H1.1 reads as follows:

Conspiracy to Interfere with Civil Rights; Going in Disguise to Deprive of Rights

(a) Base Offense Level (Apply the greater)
  (1) 15; or
  (2) 2 plus the offense level applicable to any underlying offense.
(b) Specific Offense Characteristic

(1) If the defendant was a public official at the time of the offense, increase by 4 levels. The Commentary to this section states that the "[u]nderlying offense ... includes any offense under federal, state, or local law other than an offense that is itself covered under Chapter Two...."

the court could use the base offense level of 15, but then should add a two-level adjustment under § 3A1.3 for offenses in which a victim is restrained. The government also argued that Pike should receive an upward adjustment as an organizer of the conspiracy under § 3B1.1(a).

The district court instead followed the recommendation of the probation department, and sentenced Pike and Goodman using a base offense level of 15. The court stated:

Having heard how this conspiracy unfolded ..., the court has concluded that the ultimate goal in this conspiracy was to have Rick Pardue neutralized as a threat to the personal and business interest of David Tingley.... As a corollary to his being neutralized the acts would also effectively destroy Pardue's reputation so that he would not be a credible witness against the Tingleys in any further matter. The court finds no basis for comparing these acts to the more egregious offenses of kidnapping and unlawful restraint under section 2A4.1

The court also overruled the request for an additional adjustment under § 3A1.3 for restraint of a victim, because the act of false arrest includes restraining the victim so that the restraint "cannot be seen as a separate victim related adjustment." The court also overruled the government's objection that Pike should be sentenced as an organizer.

On appeal, the government makes much the same argument it did before the sentencing court. It argues that the court should have applied the base offense level for unlawful restraint contained in § 2A4.1, or in the alternative that it should have adjusted the offense level upward under § 3A1.3 because the victim was physically restrained. For support, the government cites *United States v. Gresser*, 935 F.2d 96 (6th Cir.), *cert. denied*, 502 U.S. 885, 112 S.Ct. 239, 116 L.Ed.2d 195 (1991), which held that it was error for a sentencing court not to apply the guideline for the underlying offense of arson under § 2K1.4, for a conspiracy to interfere with civil rights involving a cross-burning.

We must determine whether the fact that Pardue was ultimately restrained should be accounted for by a sentence under § 2A4.1, because the underlying offense is analogous to a federal crime sentenced under the "kidnapping, abduction [or] unlawful restraint" guideline; whether it should be accounted for by enhancing the sentence as provided in § 3A1.3; or whether the restraint is irrelevant for sentencing purposes.

B

■■■ The government urges us to find that the sentence in this case should be calculated using the "kidnapping, abduction, [or] unlawful restraint" guideline, for a proper base offense level of 26. USSG §§ 2A4.1; 2H1.1. We decline to do so, finding instead that the facts of this case would not support a conviction for such an underlying offense.

We consider first what federal crimes would be sentenced under § 2A4.1. These include 18 U.S.C. §§ 112(a) (assaulting foreign officials, official guests, and internationally protected persons); 115(a) and (b)(2) (influencing, impeding, or retaliating against a Federal official); 351(b), (c), and (d) (Congressional, Cabinet and Supreme Court assassination, kidnapping, and assault); 1153 (kidnapping in Indian country subject to same penalties as in United States jurisdiction); 1201 (kidnapping); 1203 (hostage taking); and 1751(b), (c), and (d) (Presidential and Presidential staff assassination, kidnapping, and assault). Clearly, neither Pike nor Goodman could have been convicted of these crimes. The conduct at issue in this case is not similar to the conduct that falls within the scope of these crimes.

We note that the underlying offense in this crime might be more analogous to obstruction of justice. See 18 U.S.C. §§ 1512 (tampering with a witness), 1513 (retaliating against victim, witness, informant). However, the base offense level for each of these offenses is 12. See USSG § 2J1.2 (obstruction of justice). Had the sentencing court considered this alternative, and increased the base level for "substantial interference with the administration of justice" (which could probably be supported with the egregious facts of this case) this method only renders a base level of 15. The base level for these other offenses is not greater than the default level of 15 provided in § 2H1.1(a)(1), so the

sentencing court would use level 15 as provided in § 2H1.1(a)(1).

We next consider what state offense the defendants might have committed. In Kentucky, the elements of kidnapping are defined in Ky.Rev.Stat. § 509.040(1). They include the unlawful restraint [10] of another with the intent to hold for ransom, accomplish or advance the commission of a felony, inflict bodily injury or to terrorize the victim or another, interfere with a government or political function, or use as a shield or hostage. Kidnapping is a Class B felony when the victim is released alive and in a safe place, a Class A felony when the victim is released but is injured or not released in a safe place, and a capital offense when the victim is not released alive or dies subsequent to release.[11] Ky.Rev.Stat. § 509.040(2). Kentucky also recognizes the offense of unlawful imprisonment in the first degree, Ky.Rev.Stat. § 509.020(1), which punishes the knowing and unlawful restraint of another person "under circumstances which expose that person to a risk of serious physical injury." First degree unlawful imprisonment is a Class D felony. Kentucky also punishes the offense of unlawful imprisonment in the second degree under Ky.Rev.Stat. § 509.030(1), which is "knowingly and unlawfully restrain[ing] another person." Second degree unlawful imprisonment is a Class A misdemeanor.[12]

We do not believe that convictions for the state crimes of kidnapping or unlawful imprisonment in the first degree could be supported by the facts of this case. Therefore, they do not provide an analogous underlying offense under state law that justifies sentencing Goodman and Pike under § 2A4.1. While the Pardue arrest may fit the elements of second degree unlawful imprisonment, we cannot find that the federal Sentencing Guidelines intended to sentence this misdemeanor offense as a level 24 crime. The

elements of second degree unlawful imprisonment under Kentucky law are far less serious than the federal crimes sentenced under § 2A4.1.

We also note that "false arrest" is not usually raised as a crime, but instead as a tort. False arrest is often claimed in constitutional tort cases brought under § 1983. *See Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Adams v. Metiva*, 31 F.3d 375 (6th Cir.1994); *McCune v. City of Grand Rapids*, 842 F.2d 903 (6th Cir.1988).

In contrast, when a police officer is convicted under § 241 or § 242, and sentence imposed using Guideline § 2A4.1, it is often in cases in which the police are charged with brutalizing an arrestee. *See, e.g., United States v. Koon*, 34 F.3d 1416 (9th Cir.1994). In such cases, we reach the conclusion that the defendants have committed an underlying offense of aggravated assault without difficulty. Nor is it difficult to conclude that cross-burnings incorporate the underlying federal offense of arson. *United States v. Gresser*, 935 F.2d 96 (6th Cir.), *cert. denied*, 502 U.S. 885, 112 S.Ct. 239, 116 L.Ed.2d 195 (1991); *United States v. Worthy*, 915 F.2d 1514 (11th Cir.1990). However, we cannot agree with the government that the same is true here regarding this false arrest and the underlying offenses sentenced using the "Kidnapping, Abduction, Unlawful Restraint" guideline.

Therefore, we agree with the sentencing court that the conduct in this case does not support a sentence calculated from a base level of 24 as provided in § 2A4.1. The defendants did not commit an offense that would be sentenced at this level under federal law, nor did they commit any analogous state law offense.

---

10. Ky.Rev.Stat. § 509.010 provides the definition of "restrain" applicable to this chapter: " 'Restrain' means to restrict another person's movements in such a manner as to cause a substantial interference with his liberty by moving him from one place to another or by confining him either in the place where the restriction commences or in a place to which he has been moved without consent."

11. Under Ky.Rev.Stat. § 532.060, the sentences for felonies are: Class A, 20 years to life; Class B, 10 to 20 years; Class C, 5 to 10 years; Class D, 1–5 years.

12. Under Kentucky law, a Class A misdemeanor is a crime punishable by a maximum term of between 90 days and 12 months. Ky.Rev.Stat. § 532.020.

C

The government suggests a second alternative on appeal. It argues that we should apply the base level of 15, as provided in § 2H1.1, and adjust upward two levels for physically restraining the victim as provided in § 3A1.3. The definition of "physically restrained" for this section is contained in the Commentary to § 1B1.1, which states " 'physically restrained' means the forcible restraint of the victim such as by being tied, bound, or locked up." However, § 3A1.3 states that its adjustment should not be applied "where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself. . . ."

We find that the civil rights crime charged here under §§ 241 and 242 does not contain physical restraint as an element of the offense. As the government notes, it is a violation of § 241 to cast false votes, see *Anderson v. United States*, 417 U.S. 211, 226, 94 S.Ct. 2253, 2263, 41 L.Ed.2d 20 (1974), but this offense involves no "physical restraint." We note that the background to § 2H1.1 states that "the base offense level for this guideline assumes threatening or otherwise serious conduct." Therefore, threatening and serious conduct can be considered as a factor "specifically incorporated" in the guideline. But we do not see that restraint is likewise incorporated. We hold that a proper application of the Sentencing Guidelines would sentence Pike and Goodman starting with the base offense level provided in § 2H1.1. Goodman's sentence would then be adjusted upward two levels for physically restraining Pardue. Since Pike was convicted of a conspiracy that involved the false arrest, and physical restraint of Pardue, his sentence should also be adjusted upward two levels.

In summary, we agree with the sentencing court that the base offense level provided in § 2A1.4 is not appropriate for this case. However, the element of physical restraint in this false arrest is not irrelevant for sentencing purposes. Instead, we hold that a proper interpretation of the Sentencing Guidelines starts with a base offense level of 15, as provided in § 2H1.1, adjusted upward two levels for physical restraint of the victim, as provided in § 3A1.3.

D

The district court calculated that Goodman should receive an adjusted base offense level of 15. Under the Guidelines, this would result in a sentence of 18–24 months. Instead, the court departed under 18 U.S.C. § 3553(b) [13] and sentenced Goodman to three years probation, with the first six months to be served in a half-way house. The court determined that Goodman should not serve a longer sentence than David Tingley, who from all indications masterminded the false arrest.

The government argues first that Goodman's minor role cannot justify a downward departure under § 3553(b), because this is a factor the Guidelines provide for specifically in § 3B1.2. The government also argues that there is no support in the record to justify departing downward based on coercion, duress, or diminished capacity, which were the factors cited by the sentencing court in its statement of reasons.

We have held that district courts "are not precluded *as a matter of law* from departing from the guidelines" to conform one conspirator's sentence to the sentences of co-conspirators. *United States v. Nelson*, 918 F.2d 1268, 1273 (6th Cir.1990). However, we have also stated that reducing a defendant's sentence to bring it in line with the sentences of co-conspirators also introduces a disparity

---

13. The justification provided in the court's "Statement of Reasons" states:

Upon the court's own motion, a downward departure was deemed to be appropriate in this case due to the following factors, in part. The defendant had a minimal role in the overall scheme of this offense and the Court believes that he deserves to receive a sentence no more severe than that received by the organizer of this conspiracy, David Tingley, who benefited from a very favorable deal with the Government. The Court chose to reduce Mr. Goodman's sentence in the "interest of justice." Other factors include in part "Coercion and Duress" as provided in Section 5K2.12 and "Diminished Capacity" as provided in Section 5K2.13.

between that defendant's sentence and those of other similar defendants nationwide. *United States v. LaSalle*, 948 F.2d 215, 218 (6th Cir.1991). In *LaSalle*, this court held that departing from the Guidelines "simply to eliminate a disparity as compared to his co-defendants' sentences is unreasonable." *Ibid.* (citing *United States v. Gessa*, 944 F.2d 265 (6th Cir.1991); *United States v. Parker*, 912 F.2d 156 (6th Cir.1990); *Nelson*, 918 F.2d at 1275).

Here, the court departed downward in part to bring Goodman's sentence in line with an "unindicted co-conspirator" who was not a co-defendant. This situation presents a weaker argument for downward departure than *La-Salle*, where the district court attempted to harmonize the sentences of indicted co-conspirators. We find that this reason alone could not support a downward departure in this case.

However, the sentencing court provided other reasons for downward departure, namely coercion, duress, and diminished capacity. These factors are not supported by the record. Under § 5K2.12 (Coercion and Duress), the policy statement states that the defendant should be subjected to "serious coercion, blackmail or duress" and "[o]rdinarily coercion will be sufficiently serious to warrant departure only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency." Under § 5K2.13, the court may depart if the defendant has "significantly reduced mental capacity" to the extent "reduced mental capacity contributed to the commission of the offense." We do not find evidence in the record to warrant departure under these sections.

We have already found that the base offense level for Goodman's sentence was erroneously calculated. Furthermore, under relevant case law, the district court cannot depart downward to reconcile Goodman's sentence simply because Tingley made a good deal with the authorities. In addition, the record does not support the other bases given to justify a downward departure, nor does the court discuss why they apply. We cannot state that no bases for a downward de-

parture could exist in Goodman's case, but only that the ones applied at the initial sentencing are erroneous.

## V

We AFFIRM the convictions of Pike, Epley and Goodman. We VACATE the sentences given Pike and Goodman, and REMAND for resentencing proceedings consistent with this opinion.