UNITED STATES of America,
Plaintiff–Appellee,

v.

Josephine A. BROWNING,
Defendant–Appellant.

No. 00–3438.

United States Court of Appeals,
Sixth Circuit.

March 1, 2002.

874

Before JONES, DAUGHTREY, and COLE, Circuit Judges.

PER CURIAM.

The defendant, Josephine Browning, was charged in a 101–count indictment with illegal receipt of reimbursement checks for fraudulent Medicare claims and attempted concealment of the source of those proceeds. Following a lengthy trial, the jury convicted Browning of conspiracy to commit mail fraud related to the improper claims, 60 individual counts of mail fraud, and one count of conspiracy to commit money-laundering. The district court then sentenced the defendant to concurrent 60–month sentences for all convictions involving the mail fraud and a concurrent 120–month prison sentence for the conspiracy to commit money-laundering. The court also ordered restitution payments in the amount of $15,270,432.99. On appeal, Browning contends both that the government did not adduce sufficient evidence at trial to support the money-laundering conviction and that the district court improperly sentenced the defendant. We find no reversible error and, therefore, affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In January 1993, Josephine Browning began working for Harris Medical Supply, Inc., a supplier of durable medical equipment that was run by spouses William and Kay Harris. Almost immediately, the defendant acquired greater responsibility with the organization, was named "vice-president of corporate affiliates," and by 1995, was "the day-to-day boss at Harris Medical." In fact, the defendant and William Harris eventually met daily behind closed doors to plot corporate strategy and Browning became responsible for all activities of the corporation other than signing the business's checks.

Harris Medical Supply's business involved the assembly and sale of "incontinence kits" that were marketed to nursing homes, hospitals, and private individuals. Originally, the kits contained a cleansing spray, soap, a protective cream, latex gloves, and an absorbent pad to be placed under the patient to protect the bedding from urine and other stains. The company's sales force incorrectly informed the purchasers of the kits that Medicare not only would pay the full cost of the supplies but also authorized three such kits per patient per day. Furthermore, shortly after Browning's employment with the company began, Harris Medical Supply substituted adult diapers for the pads in the kits.

The parties do not dispute that Medicare has never covered diapers as a reimbursable item for any purpose. Thus, rather than bill Medicare for "diapers," the company would charge the government for "external urinary collection devices" or "incontinence kits." In other instances, company employees, at defendant Browning's direction, would obscure the written doctors' orders for non-reimbursable items with white-out, insert a different code number for a device for which Medicare would pay, photocopy the document to make the alteration more difficult to detect, and shred the original order. Testimony offered at trial indicated that the defendant ordered at least four Harris Medical Supply employees—Tracy Mucci, Kellie Pawlicki, Holly Reinke, and Michelle Toms—to engage in such illegal activities.

Eventually, Medicare fraud investigators uncovered the wrongdoing and removed Harris Medical Supply from the list of approved Medicare suppliers. The company, through Browning, received a notice of the suspension of Medicare payments and also was ordered to reimburse Medicare $6,120,000 for fraudulent billings through September 21, 1994. Rather than do so, however, Browning and the Harrises simply ceased providing non-reimbursable items through Harris Medical Supply accounts and, instead, began making fraudulent claims on behalf of Kay Medical Supply, Inc., a company named after Kay Harris. Investigators subsequently suspended Medicare payments to Kay Medical Supply also, but the defendant and the Harrises remained undeterred.

In response to the setbacks to their plans, Browning and the Harrises coerced company employees to sign documents creating "straw companies" whose sole purpose was to receive the Medicare payments for improper supplies. For example, they had Sharon Cassity sign documents previously filled out by the defendant to allow HMS Medical Supply, Inc., to become a Medicare supplier. Similarly, Browning prepared applications for the signature of Holly Reinke so that Reinke could open a business under the name of Home Medicare Supply, Inc., and she herself filled out an application for HICS Medicare Supply, Inc., to operate as yet another supplier who could receive Medicare reimbursement funds. In each instance, the "owner" of the compa-

ny provided her own home address and personal telephone number for the requisite background information and also untruthfully stated that the new companies were not in any way affiliated with another entity that had or did receive Medicare funds. To conceal the deception even further, Browning additionally directed Sharon Cassity to use different names when calling for or receiving messages for each of the straw companies and obtained post office boxes for each new company in a town different from that in which Harris Medical Supply and each of the other straw companies were located. Nevertheless, all monies received from Medicare into the straw companies accounts were quickly withdrawn by Browning and the Harrises and deposited back into the Harris Medical Supply bank account, either by wire transfer or by check, thus concealing the funds from anyone attempting to locate those assets.

At trial, the government also offered testimony that the defendant, as the admitted director of all financial and investment activities for the varied Harris companies, oversaw transactions by which money received from Medicare reimbursements was used to purchase real estate in the area. Specifically, an investigator related how, on December 9, 1993, $1,220,000 was transferred from the Harris Medical Supply savings account to the company's checking account, how a cashier's check in that amount was written on the checking account, and how that cashier's check was then paid to a title company for the purchase of rental property.

Based upon the evidence presented, the jury found Browning guilty of conspiring with Harris to commit mail fraud, conspiring with Harris to commit money-laundering, and actually committing 60 acts of mail fraud. The fact-finders did, however, acquit the defendant of all charges involving the actual laundering of the ill-gotten Medicare proceeds. In sentencing the defendant, the district court grouped the convictions relating to mail fraud with the money-laundering charge and then adjusted the sentencing range upward by enhancing Browning's sentence three levels for her management role in the commission of the offenses and two additional levels for obstructing justice. Because the resulting guideline sentencing range exceeded the statutory maximum sentence of 120 months, the court imposed only a 120-month sentence for the conspiracy to commit money-laundering offense, a sentence ordered to run concurrently with the 60-month sentence for the mail fraud offenses. The district court further ordered Browning held jointly and severally liable for restitution in an amount in excess of $15,000,000. From that judgment, the defendant now appeals.

## DISCUSSION

### I. Sufficiency of the Evidence

On appeal, Browning concedes that the evidence adduced by the prosecution was more than sufficient to support her convictions for conspiracy to commit mail fraud and for the individual mail fraud charges. She does contest, however, the legal sufficiency of the evidence offered to support her conviction for conspiracy to commit money-laundering.

In analyzing any challenge to the sufficiency of the evidence adduced at trial, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In doing so, however, we may not re-weigh the evidence, reevaluate the cred-

ibility of the witnesses, or substitute our judgment for that of the jury. *See United States v. Hilliard,* 11 F.3d 618, 620 (6th Cir.1993).

As we noted in *United States v. Milligan,* 17 F.3d 177, 182–83 (6th Cir.1994):

To establish conspiracy, the government must prove an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy. Proof of a formal agreement is unnecessary, because acts done with a common purpose can establish an implicit agreement. A tacit or mutual understanding among conspirators is sufficient to show conspiratorial agreement, and conspiracy may be inferred from relevant and competent circumstantial evidence, such as acts of the conspirators themselves. Once the existence of a conspiracy is established, slight evidence is sufficient to implicate a defendant. A defendant may be guilty of conspiracy despite possessing limited knowledge of the conspiracy's scope, details and membership. A defendant, however, must know the purpose of the conspiracy.

(Citations omitted.)

Count 101 of the indictment returned against Browning alleged that she and co-defendant William Harris conspired to commit money-laundering by agreeing both to conceal and to disguise the nature of the illegally-received Medicare payments by transferring the funds from the accounts of the straw companies to the Harris Medical Supply account and by withdrawing those funds to purchase real estate. Prosecution testimony clearly supports those allegations.

As in most conspiracies, the trial evidence does not include any document that verifies a formal agreement between the co-conspirators. Nevertheless, other information available to the jurors indicates that Browning, in conjunction with Harris, created straw companies with knowledge that they were to be used for illegal purposes. The defendant, for example, had other employees sign papers as owners of the shell companies, directed Sharon Cassity to identify herself by different names when she transacted the business of each company, opened post offices boxes in different cities for each company, and admitted that she was responsible for all financial dealings of the various companies associated with the equipment supply business, other than writing the checks.

As further evidence of the "understanding" the defendant had with Harris about the need to sanitize the reimbursement payments, the government presented at trial an application for general liability insurance Harris prepared seeking coverage for Harris Medical Supply, as well as Kay Medical Supply and the straw companies. After seeing the connected companies listed together on the document, the defendant wrote to Harris, "This is the kind of things [sic] that tie [sic] everything together. What is the sense of all the work to split everything up when you do things like this."

The record thus establishes that Browning and William Harris at least tacitly agreed to launder money. The evidence clearly supports the conclusion that the two individuals agreed to conceal the proceeds of the Medicare scam delivered to the straw companies by intermingling those funds in the Harris Medical Supply accounts and then using the money to purchase real estate, further removing the proceeds from the surroundings of the illegal activities from which they were garnered. The defendant's challenge to the sufficiency of the evidence has no merit.

## II. Sentencing Issues

### A. Refusal to Depart Downward to Eliminate Sentencing Disparity

Browning next argues that the district court erred in refusing to depart downward in imposing her sentence so as to bring her punishment more in line with the extent of her culpability for the criminal activities. In a similar vein, she contends—for the first time—that she should not be held responsible for repayment of the entire restitution amount because William Harris reaped the vast majority of the financial benefits from the schemes.

■ We conclude that this argument must fail. We note initially the principle of law, firmly entrenched in Sixth Circuit jurisprudence, that, absent a mistaken belief by a district court that it is without legal authority to depart downward from a suggested guideline sentencing range, a reviewing court is without jurisdiction to review on appeal the decision *not* to so depart. *See United States v. Henderson,* 209 F.3d 614, 617 (6th Cir.2000). In order to circumvent that bar, the defendant insists that the district judge in this matter indicated that he did not believe that he possessed the statutory authority to lessen the impact of the calculated guideline sentence. Such an argument, however, misconstrues the meaning behind the ruling of the district court on the defendant's request.

In discussing the motion by the defendant to equalize the sentences of the two co-conspirators and the quandary in which he was placed, the district judge cited the case of *United States v. Nelson,* 918 F.2d 1268 (6th Cir.1990), for the proposition that "a sentencing judge is not precluded as a matter of law from considering disparity or lack of proportionality in sentencing." The district court also recog-

nized, however, that other pronouncements in *United States v. Parker,* 912 F.2d 156 (6th Cir.1990), and *United States v. Gessa,* 944 F.2d 265 (6th Cir.1991), *opinion vacated and case reheard en banc,* 971 F.2d 1257 (6th Cir.1992), have intimated that consideration of such disparities in imposing sentence upon a co-conspirator is unreasonable, and, citing the unpublished decision in *United States v. Salyers,* No. 97–5939, 1998 WL 708729 at *1 (6th Cir. Sept. 29, 1998), concluded that "uniformity of sentences between co-defendants is not appropriate where a basis for disparity exists." Thus, in this case, the district judge recognized that he was *not* absolutely precluded from departing downward from the applicable sentencing range; rather, he determined only that to do so under these circumstances would be unreasonable because valid reasons for the different treatment of the co-conspirators existed. Because the district judge thus did not base his decision on a perception that he had no authority to consider relevant differences in the facts applicable to the two individuals, we are without jurisdiction to review the refusal to depart downward from the sentence required by strict application of guidelines principles.

■ Even if the court had misconstrued its authority so as to permit appellate review of this aspect of the sentencing determination, a downward departure in this case solely to equalize the defendant's sentence with that of a co-conspirator would be unreasonable, because valid reasons existed for the disparity in sentencing between Browning and Harris. *See United States v. Epley,* 52 F.3d 571, 583–84 (6th Cir.1995). Specifically, the district judge emphasized that Browning chose to forego the opportunity to negotiate a plea agreement with the government, as was her right, but that William Harris not only pleaded guilty to the charges against him,

but also cooperated with the government in the criminal forfeiture of all his assets, a forfeiture that the court noted was "the largest or at least one of the two or three largest criminal forfeitures in the country." Based upon that difference between the co-conspirators alone, even without consideration of Browning's efforts to obstruct the administration of justice, the decision of the court not to depart downward from the guideline range would have been justified.

■ Browning also contends that she should not have been held equally responsible for repayment of the entire restitution amount in this prosecution because she received only $30,000–$40,000 from the illegal activities while Harris and his wife reaped millions of dollars in benefit from the fraudulent Medicare filings. Because this issue was not presented to the district court in the first instance, the defendant recognizes that this court's review is for plain error only. *See* Fed.R.Crim.P. 52(b).

Pursuant to the provisions of 18 U.S.C. § 3664(f)(1)(A), the district court was required to order restitution "in the full amount of [the] victim's losses as determined by the court and *without consideration of the economic circumstances of the defendant.*" (Emphasis added.) Furthermore, 18 U.S.C. § 3664(h) allows the sentencing court, when finding that more than one defendant contributed to the loss, *either* to "make each defendant liable for payment of the full amount of restitution" or "apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." Clearly, nothing in the statute itself mandates separate restitution findings by the district court. Moreover, in this case, although Harris did receive a much greater financial benefit from the illegal activity than did the defendant, Browning was an integral part of the

illegal operation and admittedly controlled all aspects of the financial activities of the Harris companies. In such a situation, the district court cannot be found to have committed plain erred in holding Harris and Browning jointly and severally liable for the full amount of restitution.

### B. Sentence Enhancements

#### 1. The Grouping Arrangement

Browning further complains that the sentencing judge erred in grouping the mail fraud and money-laundering offenses under § 3D1.2(d) of the sentencing guidelines, rather than under § 3D1.2(c). It appears that the thrust of the defendant's argument is her contention that court-imposed sentencing enhancements for her alleged aggravating role in the offense and for obstruction of justice apply only to the lesser mail fraud counts of the indictment and not to the more serious count involving conspiracy to commit money-laundering. According to Browning, the evidence justifying the aggravating role and obstruction of justice enhancements should thus not be considered in increasing the offense level for the money-laundering conviction. We conclude, however, that the challenged enhancements apply equally to the mail fraud and the money-laundering activities of the defendant. Hence, there can be no reversible error in the sentence based on the district court's grouping arrangement.

#### 2. Aggravating Role in the Offense

■ The defendant concedes that the applicable base offense level for conspiracy to commit money-laundering is 17 and that the base level must be increased an additional ten levels because of the monetary amount involved in the crime and the defendant's own knowledge of the illegal source of the money. Browning strenuously objects, however, to the additional

§ 3B1.1(b) three-level increase for being a manager or supervisor in criminal activity that "involved five or more participants or was otherwise extensive." She argues that she might well have been a manager or supervisor in relation *to the mail fraud* offenses, but did not function in such a manner with regard to the money-laundering conspiracy.

■ Despite those arguments, we conclude that the three-level adjustment was properly applied to the *conspiracy to commit money-laundering* offense as well. First, a criminal defendant need not manage or supervise all five people involved in the criminal activity for the enhancement to apply; indeed, Browning need only serve in a management or supervisory position vis-a-vis one other individual in a five-person scheme to justify a court's application of § 3B1.1(b). *See United States v. Owusu*, 199 F.3d 329, 347 (6th Cir.2000) (organizer/leader enhancement of § 3B1.1(a) applies even if defendant organized or led only one participant in a five-person activity). Moreover, much of the defendant's management role with the Harris companies, although directly involving the mail fraud activities, also fostered the initial success of the money-laundering activities.

Josephine Browning admittedly supervised, managed, and assisted both Sharon Cassity and Holly Reinke as those two individuals signed false applications for Medicare reimbursement eligibility and set up straw companies through which to funnel the proceeds of the illegal activity. Without creating the shell companies, and without establishing bank accounts for the business entities, Browning and Harris would not have been able to conceal the nature, source, and ownership of the proceeds of the fraudulent scheme. The defendant's activities, especially her admitted control of the companies' financial transactions and her conduct in moving money from account to account therefore involved the managing and supervising of at least one other person acting to advance the purposes of the money-laundering conspiracy.

Furthermore, five individuals were involved in the scheme. Browning and William Harris undertook the majority of the necessary actions. The defendant also involved both Cassity and Reinke in the criminal acts, as discussed previously. Finally, the defendant's own filings with this court concede that Kay Harris was also intimately connected with the money-laundering activities. In her appellate brief, Browning states that Kay Harris was an intended beneficiary of the Medicare scheme, that Kay attended and participated in many meetings where important decisions were made, and that she benefitted from the $15,000,000 withdrawn from various bank accounts and used to purchase real estate holdings.

These facts alone show, by a preponderance of the evidence, that at least five persons were connected with the money-laundering activities and that Browning managed or supervised at least one of them. Consequently, the district court did not err in determining that Browning's sentence should be increased three levels for her aggravating role as a manager or supervisor of the money-laundering conspiracy.

### 3. Obstruction of Justice

■ In a final issue, Browning contests the propriety of the district court's two-level enhancement for obstruction of justice. Pursuant to the provisions of § 3C1.1 of the 1998 edition of the sentencing guidelines:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede the administration of justice

during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

When reviewing the application of this sentencing enhancement, the court employs a three-pronged analysis. As explained in *United States v. Roberts,* 243 F.3d 235, 237 (6th Cir.2001):

First, this Court applies a clearly erroneous standard to the district court's findings of fact with respect to the enhancement. Second, a district court's determination of whether facts constitute obstruction of justice is a mixed question of law and fact that requires *de novo* review. Third, once there has been a finding that the defendant obstructed justice, application of the enhancement is mandatory, so review of the enhancement at that point is *de novo.* (Citations omitted.)

Our review leads to the unmistakable conclusion that the obstruction of justice enhancement was appropriate in this case. In explaining his imposition of the two-level increase, the district judge listed four *independent* bases for the enhancement: "destruction of records regarding co-payments, ... ordering [certificates of medical necessity] to be altered and then the originals destroyed, the ordering of Cassity to destroy records kept at her home after the search, the false statements made during the suppression hearing." Clearly, the first two of the rationales are directly tied to the mail fraud convictions. Regardless of the subject matter of the destroyed material in Cassity's home, however, the perjurious statements made at the suppression hearing are, by themselves, sufficient to permit enhancement of the conspiracy to commit money-laundering sentence.

As noted by the district court in a post-sentencing memorandum, Browning testified falsely at a pretrial suppression hearing that:

(1) she did not have complete control over all employees at Harris Medical; (2) it was not part of her job to set the duties of subordinate employees; (3) it was not part of her job to determine how work would flow between various departments; and (4) it was not part of her job to train sales representatives and she would not know how to train one.

Clearly, the defendant's efforts to misrepresent the extent of her responsibility for the misdeeds in which she and her co-conspirator engaged constitute a gambit that falls within the classic conception of obstruction of justice and should not be tolerated by the judicial system. By downplaying her connection with the decision-making processes of the Harris companies, Browning certainly gave a false impression of her connection with even the most intricate details of the Harris companies' financial situation and deceptive maneuverings. The district court thus did not err in concluding that the obstruction of justice sentence enhancement applied to the defendant's conspiracy to commit money laundering conviction in this case.

### CONCLUSION

For the reasons set out above, we AFFIRM the judgment of the district court, both as to the defendant's convictions and the resulting sentencing order.